UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOANNE NORIEGA,

Plaintiff,

-v-

ABBOTT LABORATORIES,

Defendant.

23 Civ. 4014 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This putative class action involves claims that a manufacturer falsely marketed its pediatric nutrition beverage as helping children grow taller. Joanne Noriega sues Abbott Laboratories ("Abbott"), claiming that the packaging and marketing of its beverage, PediaSure Grow & Gain ("PediaSure"), has thus misled consumers. Noriega claims that she purchased PediaSure for her grandson based on Abbott's representation that PediaSure is "Clinically Proven to Help Kids Grow" (the "challenged statement"). That claim, she alleges, allows Abbott to charge a price premium for the product. Noriega brings claims under New York General Business Law ("GBL") §§ 349 and 350, which prohibit deceptive business acts/practices and false advertising.

With discovery complete, Abbott has moved for summary judgment on Noriega's claims. And both parties have moved, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude the opinion testimony of the other's proposed experts. Abbott has moved to exclude the testimony of Dr. Gita Johar (as to consumer perception of the challenged statement), Dr. Daniel Hoffman (as to scientific studies of PediaSure's effects on growth), and Dr. William Ingersoll (as to the price premium attributable to the challenged statement). Noriega

has moved to exclude the testimony of Dr. Ran Kivetz (as to the materiality of the challenged statement) and Dr. Melvin Heyman (as to scientific studies).

For the reasons that follow, on Abbott's *Daubert* motions, the Court grants the motion to exclude Dr. Ingersoll's testimony; denies the motion to exclude Dr. Johar's testimony; and grants in part and denies in part the motion to exclude Dr. Hoffman's testimony. On Noriega's *Daubert* motions, the Court denies, save as to one minor point, the motion to exclude Dr. Kivetz's testimony; and grants in part and denies in part the motion to exclude Dr. Heyman's testimony. The Court denies Abbott's summary judgment motion.

## I.     Background

### A.     Factual Background[1]

#### 1.     The Parties

Noriega is a grandmother residing in the Bronx, New York. Dkt. 76 ("JSF") ¶ 4. She has a minor grandson ("L.V."), born in 2012. *Id.* ¶ 5. Abbott is an Illinois corporation that markets and sells pediatric nutrition products under the brand name PediaSure. *Id.* ¶¶ 1, 3, 6.

---

[1] The Court draws its account of the facts from the parties' submissions on summary judgment, including their joint statement of undisputed facts, Dkt. 76 ("JSF"); Abbott's Rule 56.1 statement, Dkt 79 ("Def. 56.1"); Noriega's counterstatement to Abbott's Rule 56.1 statement, Dkt. 96 ("Pl. Counter 56.1"); Abbott's response to Noriega's Rule 56.1 counterstatement, Dkt. 108 ("Def. Resp. 56.1"); and exhibits submitted by both parties in connection with the summary judgment motion, Dkts. 80, 97, 109.

Citations to the JSF or a party's 56.1 statement incorporate the evidentiary materials cited therein. When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

2

### 2.    The PediaSure Product and Label

One of PediaSure's product lines is PediaSure Grow & Gain ("PediaSure"), an oral nutrition supplement for children ages 2–13 that comes in liquid shake and powdered shake mix forms. *Id.* ¶¶ 6–7; Dkt. 96 ("Pl. Counter 56.1") ¶ 69. Since at least May 16, 2020, Abbott has marketed PediaSure with the statement, "Clinically Proven[†] to Help Kids Grow," and an accompanying footnote (the "disclaimer") on the label.[2] JSF ¶ 7. The disclaimer has at various times read: "Studied in children at risk for malnutrition"; "Studied in children at risk for malnutrition, 2 servings per day," or "Studied in children with and/or at risk for undernutrition, 2 servings per day." *Id.* ¶ 8. The disclaimer has appeared in different colors, sometimes set against a background of the same color, *see* Ex. XXX, and other times against a contrasting background, *see* Ex. 16.[3]

The PediaSure label is reproduced below in one of its iterations. In addition to the challenged statement and disclaimer, the label includes the following features. It displays a cartoon giraffe wearing sunglasses, next to tick marks that resemble a ruler. *See* Exs. 14–17 (sample labels). Under the PediaSure name, the label states, "Grow & Gain," and below that, "With Immune Support." *Id.* The label contains circles, each with words touting a product attribute, such as "27 Vitamins & Minerals," "7g Protein," and "#1 Pediatrician Recommended Brand." Ex. 15. On the back of the label are facts related to nutritional content. *Id.*

---

[2] The disclaimer has at times been notated by an asterisk (*), pilcrow (¶) or section symbol (§) instead of a dagger (†). Def. Resp. 56.1 ¶ 259.

[3] Numbered exhibits were submitted by Abbott, and lettered exhibits by Noriega, in connection with the motion for summary judgment. *See* Dkts. 80, 97, 109.



Ex. 14.

Many of these features did not appear on earlier versions of PediaSure's packaging. Salient here, instead of a giraffe and tick marks, the label previously displayed an image of a lion. Pl. Counter 56.1 ¶ 110. And instead of the challenged statement, the label read, "Helps Kids Grow." *Id.* ¶ 112.

### 3. PediaSure Commercials

At least two television commercials for PediaSure contain the challenged statement. Pl. Counter 56.1 ¶ 249. The "worried mom commercial" depicts a child who is shorter than the children next to him, and who stands on his tiptoes to appear taller. *Id.* ¶ 251; Ex. HH. The voice of a mother states: "Before PediaSure, I was concerned that he was behind in growth." Pl. Counter 56.1 ¶ 251. She states that her child's pediatrician told her to try PediaSure, and that

4

"it's clinically proven to help kids grow." *Id.* ¶ 252. The commercial displays the word, "GROWTH," above an image of a child standing next to tick marks. *Id.*

The "basketball commercial" depicts a child standing between two taller children, one of whom is holding a basketball. *Id.* ¶ 254; Ex. II. The child states that he has "got a lot to look up to." Pl. Counter 56.1 ¶ 254. The child states that his mother was "concerned about my growth," as the commercial depicts a mother measuring the child's height against a doorframe. *Id.* ¶ 255. The child states that his mother tried PediaSure because it is "clinically proven to help kids grow." *Id.* ¶ 256.

### 4.    Abbott's Clinical Studies

The PediaSure product page of Abbott's website lists six published studies ("Abbott's studies") as references. Dkt. 79 ("Def. 56.1") ¶ 4; Ex. 43. The studies assessed the effects of PediaSure. Def. 56.1 ¶ 4. In addition to the studies listed on its website, Abbott completed data collection in another study, referred to as "AL-48," in late 2024, after the filing of this lawsuit. Pl. Counter 56.1 ¶ 246. Whereas Abbott's earlier studies had largely been conducted on children outside of the United States (*e.g.*, the Philippines, Taiwan, Pakistan and Peru), *id.* ¶¶ 7, 11, 14, 17, 20, AL-48 studied the effects of PediaSure in children in the United States, Def. 56.1 ¶ 26.

### 5.    Noriega's Purchase of PediaSure

In January 2022, Noriega first purchased PediaSure for L.V. Pl. Counter 56.1 ¶ 291. She had seen a commercial for PediaSure about a child who is shorter than his classmates, which stated that the product is clinically proven to help kids grow. Dkt. 129 ("Noriega Dep.") at 48–49. The commercial caught her attention because one of her grandkids—L.V.—was shorter than his classmates and siblings. Pl. Counter 56.1 ¶ 291; Noriega Dep. at 48, 71. Based on the

challenged statement and label imagery, she attests, she concluded that PediaSure would help L.V. grow taller. Noriega Dep. at 85, 125.

Between January 2022 and February 2023, Noriega purchased L.V. two PediaSure bottles per day every weekday. Pl. Counter 56.1 ¶ 292. In total, she purchased approximately 400 bottles of PediaSure. *Id.* ¶ 293. She claims she paid, in cash, $3.25 for every bottle she purchased. *Id.* ¶¶ 294–95. She stopped purchasing PediaSure because she did not "see any results"—L.V. "didn't grow the amount that [she] was expecting." Def. Resp. 56.1 ¶ 301; Noriega Dep. at 142–43.

### B.    Procedural History

On May 15, 2023, Noriega commenced this action. Dkt. 1 ("Compl." or "Complaint"). On July 23, 2023, Abbott moved to dismiss the Complaint. Dkt. 17. On February 2, 2024, the Court denied Abbott's motion in its entirety, finding the Complaint plausibly pled that the challenged statement was materially misleading to reasonable consumers, in violation of GBL §§ 349 and 350. Dkt. 30.

On March 14, 2024, the Court issued a case management plan, Dkt. 37, the deadlines of which it later extended at the parties' request, Dkts. 52, 63, 66, 70. The parties completed fact discovery on May 14, 2025, and expert discovery on October 28, 2025. On November 19, 2025, at a pre-motion conference, the Court set a briefing schedule for Abbott's anticipated motion for summary judgment and the parties' anticipated *Daubert* motions. Dkt. 75.

On January 13, 2026, Abbott moved for summary judgment. Dkts. 77–78 ("SJ Mot."). On February 10, 2026, Noriega opposed. Dkt. 95 ("SJ Opp'n"). On March 3, 2026, Abbott replied. Dkt. 107 ("SJ Reply"). The parties also filed their *Daubert* briefs and supportive

materials on the schedule set by the Court. Dkts. 81, 83, 85, 90, 99. On April 30, 2026, the Court held argument on the motions. *See* Dkt. 89.

## II.    *Daubert* Motions

The Court first addresses the admissibility of the proposed expert testimony, insofar as the outcome of the pending *Daubert* challenges has the capacity to affect the pending summary judgment motion. Noriega proposes to call three experts: (1) Dr. Gita Johar, a marketing professor who opines as to how consumers would understand the challenged statement; (2) Dr. Daniel Hoffman, a nutritional sciences professor who opines as to whether Abbott's studies support the challenged statement; and (3) Dr. William Ingersoll, an economist who opines, based on a conjoint survey, that consumers paid a price premium based on the challenged statement. Abbott proposes to call two experts: (1) Dr. Ran Kivetz, a marketing professor who opines as to the materiality of the challenged statement; and (2) Dr. Melvin Heyman, a pediatrician, who opines as to whether Abbott's studies support the challenged statement.

### A.    Governing Legal Standards

"Trial courts serve as 'gatekeep[ers],' responsible for 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213 (S.D.N.Y. 2018) ("*Mirena II*") (quoting *Daubert*, 509 U.S. at 597), *aff'd*, 982 F.3d 113 (2d Cir. 2020). Federal Rule of Evidence 702 governs the admissibility of expert testimony in federal court. Courts have distilled the rule to require the proponent to show, by a preponderance, that "(1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact." *Nike, Inc. v. StockX LLC*, No. 22 Civ. 983, 2024 WL 3361411, at *2 (S.D.N.Y. July 10, 2024). Courts assess these requirements

7

in light of the "liberal standard for the admissibility of expert testimony." *United States v. Dukagjini*, 326 F.3d 45, 52 (2d Cir. 2003).

*Qualifications*: "Whether a witness is qualified as an expert is a threshold question that precedes the court's relevance and reliability inquiries." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 636 (S.D.N.Y. 2016) (quoting *Loyd v. United States*, No. 8 Civ. 9016, 2011 WL 1327043, at *4 (S.D.N.Y. Mar. 31, 2011)), *aff'd*, 720 F. App'x 24 (2d Cir. 2017) (summary order). Under Rule 702, the witness must be "qualified as an expert by knowledge, skill, experience, training, or education." *Id.* "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).

*Reliability*: "It is critical that an expert's analysis be reliable at every step." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Although the Supreme Court "has identified a number of factors bearing on reliability," such as whether a theory or technique has been tested or subjected to peer review and publication, these factors "do not constitute . . . 'a definitive checklist or test.'" *Id.* at 266 (quoting *Daubert*, 509 U.S. at 593). The reliability inquiry is "flexible, especially in cases where the expert's knowledge is non-scientific and based on his experience." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 49 (S.D.N.Y. 2016); *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony"). The Court "should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267.

Ultimately, "[t]he Court's task 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 369, 371 (S.D.N.Y. 2014) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

*Relevance*: Rule 702's requirement that expert testimony assist the trier of fact "goes primarily to relevance." *Daubert*, 509 U.S. at 591. To ensure relevance, the Court must assess whether the expert's testimony "'fits' the facts of the case." *LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 641 (quoting *Daubert*, 509 U.S. at 591–92). "For expert testimony to 'fit,' the testimony must have a valid 'connection to the pertinent inquiry' and be 'sufficiently tied to the facts of the case so that it will aid the jury in resolving a factual dispute.'" *Adesina v. Aladan Corp.*, 438 F. Supp. 2d 329, 342 (S.D.N.Y. 2006) (quoting *Daubert*, 509 U.S. at 591–92).

### B.    Abbott's Motion to Preclude Dr. Gita Johar

Dr. Gita Johar's expert report assesses how consumers would understand the challenged statement. Ex. 9 ("Johar Report"). On January 13, 2026, Abbott moved to exclude Dr. Johar's testimony. Dkts. 83–84 ("Johar Mot."). On February 10, 2026, Noriega opposed. Dkt. 92 ("Johar Opp'n"). On March 3, 2026, Abbott replied. Dkt. 103 ("Johar Reply").

### 1.    Qualifications, Methodology, and Opinions

Dr. Johar is a professor at Columbia Business School, where she has taught classes on marketing, branding, and research methods since 1992. Johar Report at 4, 35. She earned her PhD in marketing from the New York University School of Business. *Id.* at 35. She has served as a fellow and president of the Society for Consumer Psychology, and as an editor of the *Journal of Consumer Research*, *Journal of Marketing*, and *Journal of Consumer Psychology*. *Id.* at 36–37. She has published papers on topics including deceptive advertising, corrective

advertising, refutation of false beliefs formed based on advertisements, effectiveness of disclosures in advertising, and inferences and false beliefs based on advertising claims. *Id.* During her career, Dr. Johar has surveyed thousands of consumers, studying and analyzing their behavior and responses to marketing claims. *Id.* at 5.

Dr. Johar was retained by Noriega to opine on whether the PediaSure label and commercials would lead a reasonable consumer to believe that the product is clinically proven to help kids grow in height. *Id.* at 3. Her methodology consisted of three steps. First, Dr. Johar reviewed academic literature related to consumer marketing claims, and whether and when consumers can understand disclosures that purport to modify or limit such claims. *Id.* at 6. Second, she reviewed the Complaint and PediaSure labels and television commercials. *Id.* Third, she assessed, in light of the academic literature, how target consumers would process the text and imagery on the PediaSure bottle, whether consumers would notice and understand the footnote disclaimer, and what reasonable consumers are likely to believe about PediaSure. *Id.*

Dr. Johar opines that the PediaSure label would lead consumers to believe that the product is clinically proven to help kids grow tall. She based this opinion on the label's imagery of a giraffe and ruler; its use of the name "PediaSure Grow and Gain"; and the "font, size, placement, and salience" of the challenged statement. *Id.* at 7, 17. She opines that the footnote disclaimer is "unlikely to be noticed, read, [or] understood," because such would require that consumers (1) locate the disclaimer, (2) read the disclaimer, (3) understand the meaning of the limitation disclosed by the disclaimer (that children studied were "at risk" of malnutrition), (4) understand the relevance of the disclaimer to the label's representation that PediaSure has been clinically proven to help kids grow in height, and (5) correct that belief. *Id.* at 11, 18. Dr. Johar finds it unlikely that consumers would take any, let alone all, of these steps because the

10

disclaimer is obscured (due to its font size, color, and location), and substantively hard to understand (it does not state that PediaSure "was *only* studied in children at risk of malnutrition, and it does not explain what either 'at risk' or 'malnutrition' mean"). *Id.* at 13 (emphasis in original). As to PediaSure's commercials, Dr. Johar opines that the imagery and narration "make[] it clear that growth refers to height." *Id.* at 15–16. She finds it unlikely that consumers would notice the disclaimer, which appears "in small font at the bottom of the screen and is displayed for a very short amount of time." *Id.* at 15.

Based on her assessment of the PediaSure label and commercials, Dr. Johar opines that Abbott has misled consumers to believe that PediaSure has been clinically proven to help kids grow in height. *Id.* at 17. She further concludes that the challenged statement is "material" to consumers' decision to purchase the product. *Id.* at 15. She opines that consumers make decisions based on "product benefits," and that the "key benefit" communicated by the PediaSure packaging and marketing "is that the brand has been clinically proven to help kids grow." *Id.* at 14–15.

### 2. Analysis

Abbott argues that Dr. Johar's testimony should be excluded for two reasons. First, it argues, her methodology is unreliable because she failed to conduct empirical research or review case-specific data. Second, it argues, her testimony would not be helpful to the jury because her opinions are subjective.

#### a. Reliability of Dr. Johar's Methodology

Abbott argues that Dr. Johar's methodology is unreliable because she did not undertake an empirical consumer survey, which it contends departs both from "accepted practice[]" in the field and from Dr. Johar's own academic research practices. Johar Mot. at 8–9. Abbott argues that, to reliably opine about consumer perception, a marketing expert who foregoes such a study

11

must do "substantially more work than Dr. Johar did here." *Id.* at 7. Abbott faults Dr. Johar for not considering certain discovery in this case, including depositions and Abbott's internal marketing documents. *Id.* at 7–8.

A consumer survey specific to the words and imagery on the product at issue here would undeniably have assisted the trier of fact in assessing Dr. Johar's three essential conclusions: that the PediaSure label and marketing would lead consumers to believe that the product is clinically proven to help kids grow tall; that this message is material to consumer purchase decisions; and that the disclaimer would not likely have registered with consumers. Nonetheless, the Court finds reliable the sources and methodology on which Dr. Johar relied in reaching these uncomplicated conclusions. Her opinions are based on more than three decades of experience in the field of consumer behavior and marketing, during which she has surveyed thousands of consumers and published research on topics related to consumer perception and psychology. *See* Johar Report at 4–5. Dr. Johar also based her conclusions on articles she cites—one of which she authored—about aspects of product packaging that draw consumers' attention, when and how consumers process disclaimers on products, and the effect of pictures and images on consumers' beliefs about a product. *Id.* at 20–21.

Dr. Johar's education and experience, taken together with the relevant academic literature on which she relies, supplies an adequate basis for the testimony she proposes to give. *See, e.g.,* *Price v. L'Oreal USA, Inc.,* No. 17 Civ. 614, 2020 WL 4937464, at *3 (S.D.N.Y. Aug. 24, 2020) (admitting testimony about how consumers would understand product name, based on expert's 50 years of experience in advertising, over which he had interviewed thousands of consumers); *Capri Sun GmbH v. Am. Beverage Corp.,* 595 F. Supp. 3d 83, 132–33 (S.D.N.Y. 2022) ("*Capri Sun*") (although marketing professor's decision not to conduct a survey was "striking and

curious," his conclusions—based on academic literature, case materials, news articles, and statistical reports—"clear[] the admissibility bar"); *Nike, Inc.*, 2024 WL 3361411, at *10 (admitting consumer perception testimony by expert who did not conduct empirical survey but based conclusions on "vast experience"); *Lucky Brand Dungarees, Inc. v. Ally Apparel Res. LLC*, No. 5 Civ. 6757, 2009 WL 969930, at *1–2 (S.D.N.Y. Apr. 6, 2009) (admitting expert's opinions "premised on his own background and expertise in marketing and branding" and his "personal review of sample merchandise" (cleaned up)); *Colangelo v. Champion Petfoods USA, Inc.*, No. 618 Civ. 1228, 2022 WL 991518, at *13–14 (N.D.N.Y. Mar. 31, 2022) (same, where expert proposed to testify based on "extensive experience in the advertising industry"), *aff'd sub nom. Paradowski v. Champion Petfoods USA, Inc.*, 2023 WL 3829559 (2d Cir. June 6, 2023) (summary order); *In re Scotts EZ Seed Litig.*, No. 12 Civ. 4727, 2017 WL 3396433, at *15 (S.D.N.Y. Aug. 8, 2017) ("*EZ Seed*") (declining to preclude consumer perception testimony based on lack of survey).

Abbott's arguments to the contrary are unavailing.

Abbott argues that the cases on which Noriega relies are distinguishable, because, in each, the expert cited data from discovery and/or had extensive experience with the product at issue. Johar Mot. at 7; Johar Reply at 3–4. Abbott would extract from these cases a rigid rule requiring such for a marketing expert to testify about the effect of labelling and marketing on consumer perception of a product. The law governing such expert testimony is, however, more "flexible," particularly where the expert's opinions are premised on deep relevant experience. *Scott*, 315 F.R.D. at 49. Here, although Dr. Johar's analysis might well have benefited from consideration of Abbott's internal marketing materials, her failure to consider them does not make her conclusions unreliable. Aspects of those materials, as extracted in briefing on the

13

present motions, would have fortified her most central, and unsurprising, conclusion: that

PediaSure's packaging leads consumers to believe the product is clinically proven to help kids

grow *in height*. *See, e.g.*, Ex. W at 92190 (2015 PediaSure strategy presentation, finding that

inclusion of giraffe concept in packaging resulted in "significant increase in units purchased,"

and quoting consumer stating that label's "[m]easuring tape image makes it clear this product

helps with growth"); Ex. BB at 11999 (2019 business planning guide, stating that this advertising

campaign "[d]rives awareness of PediaSure as a growth solution").

Abbott relatedly notes that Dr. Johar lacks specific expertise as to children's nutrition

drinks. Given her extensive experience in consumer product marketing, however, that fact,

though fair game for cross-examination, does not support precluding her as unqualified to testify

here. *See Lion Oil Trading & Transp., Inc. v. Statoil Mktg. & Trading (US) Inc.*, No. 8

Civ. 11315, 2011 WL 855876, at *1 (S.D.N.Y. Feb. 28, 2011) ("An expert need not be

disqualified merely because he or she does not possess experience tailored to

the precise product or process that is the subject matter of the dispute." (citation omitted)).

Abbott's other arguments for exclusion are based on misrepresentations of Dr. Johar's

deposition testimony. Abbott argues that Dr. Johar departed from her typical practice in her

academic work, in which she purportedly "never" reaches a conclusion as to consumer

perception without conducting an empirical study.[4] Johar Mot. at 8–9. In fact, Dr. Johar

---

[4] Abbott argues that Dr. Johar's deposition revealed her "undisclosed use of artificial intelligence [("AI")] to prepare her report." Johar Mot. at 4. Abbott points to one error in her 18-page report—a single citation, to a different article by the same author as the article she intended to cite. Johar Opp'n at 15. Dr. Johar addressed this error in her deposition, explaining that she had used AI "to format" the references section of her report (but "not to prepare" it), and that AI could have generated an incorrect title for the article based on the information inputted by Dr. Johar. Exs. I, 3 ("Johar Dep.") at 310–11. Abbott is free to cross-examine Dr. Johar about her use of AI in this manner, and her failure to effectively cite-check this aspect of her report, but

14

testified that she conducts surveys "in *some* of [her] academic research," and that she has published "conceptual" academic articles that do not rely on original empirical research. Exs. I, 3 ("Johar Dep.") at 38 (emphasis added). Abbott also argues that Dr. Johar's "only excuse" for failing to conduct such a survey in this case was that she lacked the budget and time. Johar Mot. at 9. In fact, Dr. Johar testified that she "did not think it was necessary to do a survey" based on her experience, academic background, and the relevant literature. Johar Dep. at 73. The Court thus finds that Dr. Johar's decision not to conduct an empirical survey, when viewed in context, does not suggest a lack of thoroughness or rigor in her methodology.

> b.    *Relevance of Dr. Johar's Consumer Perception Opinions*

Abbott argues that Dr. Johar's testimony would not be helpful to the jury because the reasonable consumer inquiry under GBL §§ 349 and 350 is objective, whereas "her opinions are purely subjective." Johar Mot. at 10 (emphasis omitted).

The Court finds that Dr. Johar's testimony would be helpful to the jury. Notwithstanding Abbott's portrait of her testimony, she does not propose to set out her personal beliefs, as a consumer, about the meaning of the challenged statement on the label. Instead, she proposes to opine, as a marketing professor, based on her experience and research, about how a reasonable consumer would view and process the challenged statement in the context of PediaSure's packaging. *See, e.g.,* Johar Report at 6 (report "draw[s] conclusions on what reasonable target consumers exposed to the label are likely to believe"); *id.* at 12 (considering whether "reasonable consumer" would understand disclaimer). This testimony will help the jury in assessing whether the challenged statement would have misled reasonable consumers, or been material to their purchasing decisions. *See, e.g., Price,* 2020 WL 4937464, at *3 (admitting testimony, based on

---

this lapse, though regrettable, does not require exclusion of her testimony on the grounds of unreliable methodology.

expert's experience, as to "how a consumer would understand the Challenged Terms"); *EZ Seed*, 2017 WL 3396433, at *15 (same, as to "how consumers understood the 50% thicker claim"); *Colangelo*, 2022 WL 991518, at *13–14 (same, as to what statements "communicate to consumers" and whether consumers "are likely to rely on the veracity of these statements").

The cases on which Abbott relies are not to the contrary. In *Cover v. Windsor Surry Co.*, 2017 WL 9837932, at *17 (N.D. Cal. July 24, 2017), the court precluded an expert in wood science from testifying about how consumers would perceive marketing materials, because it was outside his area of expertise. Here, in contrast, Dr. Johar is a marketing expert, and her opinions on consumer perception are "rooted in [her] relevant expertise." *Id.* In *Kournikova v. Gen. Media Communications Inc.*, 278 F. Supp. 2d 1111, 1122 (C.D. Cal. 2003), a false endorsement case, the court stated that "expert testimony is not admissible to determine the plain meaning of a word and its effect upon a reasonable consumer." But Dr. Johar does not opine on the "plain meaning" of the words in the challenged statement—which a juror would be capable of understanding without expert testimony—but how they would be understood by a reasonable consumer in the context of PediaSure's packaging as a whole. Unlike the expert in *Kournikova*, she does not rely on dictionary definitions and internet web searches, *id.*, but on her decades-long experience in the field of marketing. Accordingly, Abbott's bid for preclusion based on the ostensible unhelpfulness of Dr. Johar's testimony is unavailing.[5]

---

[5] Abbott also argues that exclusion is required by Federal Rule of Evidence 403—which excludes evidence whose "probative value is substantially outweighed by a danger of . . . unfair prejudice"—because "jurors may assume that [Dr. Johar's] unsupported conclusions have a scientific foundation that they squarely lack." Johar Mot. at 11. That argument fails. Dr. Johar's testimony does not falsely claim a scientific methodology, and "traditional scientific methods" are not a prerequisite for expert testimony. *Doe v. City of New York*, No. 22 Civ. 2690, 2024 WL 1134568, at *5 (S.D.N.Y. Mar. 15, 2024) (citation omitted).

>>>>>>> c.      *Overall Assessment*

Based on the foregoing, the Court denies, in its entirety, Abbott's motion to exclude Dr.

Johar's testimony. *See, e.g.*, *Price*, 2020 WL 4937464, at *3 (admitting expert testimony about

consumer perception without empirical survey in case brought under GBL §§ 349 and 350);

*Colangelo*, 2022 WL 991518, at *13 (same); *EZ Seed*, 2017 WL 3396433, at *15 (same).

**C.      Abbott's Motion to Preclude Dr. Daniel Hoffman**

Dr. Daniel Hoffman's expert report focuses on whether Abbott's studies supply clinical

proof that PediaSure promotes height growth. Ex. 8 ("Hoffman Report").[6] On January 13, 2026,

Abbott moved to exclude Dr. Hoffman's testimony. Dkt. 81 ("Hoffman Mot."). On

February 10, 2026, Noriega opposed. Dkt. 98 ("Hoffman Opp'n"). On March 3, 2026, Abbott

replied. Dkt. 104 ("Hoffman Reply").

**1.      Qualifications, Methodology, and Opinions**

Dr. Hoffman is a professor in the Department of Nutritional Sciences at Rutgers

University, where he has taught for the last 25 years. Hoffman Report at 104. He earned his

PhD in human nutrition from Tufts University, a certificate in epidemiology from the World

Health Organization, and a master's degree in cell biology from The Catholic University of

America. *Id.* Between 2012 and 2022, in addition to teaching, he served as director of the

Center for Childhood Nutrition Research at the New Jersey Institute for Food, Nutrition and

Health. *Id.* He states that his expertise includes "[s]tunting and growth retardation," and

"[e]nergy metabolism and body composition." *Id.* He has published journal articles and

presented on topics related to children's nutrition and growth. *Id.* at 105–09. He has also edited

---

[6] Dr. Hoffman also provided a rebuttal expert report, in response to the testimony of Dr.
Heyman. *See* Ex. 12. Abbott has not moved to preclude that testimony.

scientific journals such as the *Journal of Nutrition* and the *European Journal of Clinical Nutrition*. *Id.* at 119.

Dr. Hoffman was retained by Noriega as a nutrition and growth expert to opine as to whether PediaSure has been—as the challenged statement represents—clinically proven to help kids grow. *Id.* at 1. He states that his testimony is based on: (1) his experience (as a professor and researcher in the field of pediatric growth and nutrition, and as the editor of nutrition journals); (2) academic articles related to nutrition and the methodology of scientific studies; and (3) his review of materials from this case. *Id.* His report covers four principal topics.

First, Dr. Hoffman addresses Abbott's claims substantiation guidance ("CSG")—an internal manual that addresses health benefit claims, the evidence necessary to substantiate such claims, and the claims development process. Ex. HHH ("CSG"). He opines that the CSG "sets mandates to be followed" by Abbott and is not "merely aspirational." Hoffman Report at 2. Dr. Hoffman opines that Abbott violated the CSG in various ways. He states that Abbott improperly applied "inapposite studies from homogenous populations in developing countries" to children in the United States, failing to conduct "bridging studies" that enable results from one population to be translated to another. *Id.* at 9. He states that Abbott failed to consider the "totality of the evidence," and instead "would bury contradictory studies." *Id.* at 12–13. And he states that Abbott failed to substantiate the challenged statement with competent and reliable scientific evidence (*i.e.*, double-blinded, randomized, controlled trials). *Id.* at 16–19.

Second, Dr. Hoffman reviews communications from Federal Trade Commission ("FTC") officials to Abbott regarding its health benefit claims. He states that the FTC "admonish[ed]" Abbott about its practice of using studies from developing countries to support marketing claims directed to U.S. consumers. *Id.* at 5–6.

18

Third, Dr. Hoffman discusses internal Abbott communications that criticized Abbott's studies, and depositions in which Abbott employees echoed those concerns. *Id.* at 19–22. He states, based on these, that "there really isn't much of a dispute, even within Abbott itself, as to the limitations of PediaSure Grow & Gain." *Id.* at 22.

Fourth, Dr. Hoffman assesses whether Abbott's studies support the challenged statement, and whether other studies undermine it. This analysis is the heart of Dr. Hoffman's report. Dr. Hoffman opines that scientific standards for "rigorous research protocols" require that a study be: randomized-controlled; unbiased; blinded in outcome measurement; adequately powered to provide accurate and reliable results; statistically rigorous; ethically conducted; of sufficient duration to observe the normal pace of height growth; involving a well-matched control group; subject to objective expert oversight; and generalizable to the target population. *Id.* at 22–24; *see also id.* at 24–44 (elaborating on each standard). He finds that Abbott's studies each violated multiple of these standards, and failed to satisfy the CSG's standards for clinical proof. *Id.* at 44–91. He concludes: "[T]hese studies do not clinically prove or show that PediaSure helps children grow." *Id.* at 91.

In addition to the topics addressed in his expert report, Dr. Hoffman opined in his deposition, based on "common sense" and his perspective as a consumer, that consumers would understand the word "grow" in the challenged statement, to refer to linear (*i.e.*, height) growth. Exs. 2, K ("Hoffman Dep.") at 54–56. Dr. Hoffman also opined that the challenged statement did not comply with FTC regulations or guidance. *Id.* at 52.

### 2.    Analysis

Abbott moves to preclude Dr. Hoffman's testimony on three grounds. First, Abbott argues that Dr. Hoffman is unqualified to offer opinions on Abbott's CSG, and that such

opinions are otherwise improper. Second, Abbott argues that Dr. Hoffman's methodology for assessing Abbott's studies is unreliable. Third, Abbott argues that Dr. Hoffman's opinions related to consumer perception and FTC compliance are improper because they were not disclosed in his report.

a.    *Opinions About the CSG*

Abbott seeks to preclude Dr. Hoffman's testimony about the CSG on the grounds that he is unqualified to opine on an internal Abbott document and cannot properly opine on Abbott's state of mind. Hoffman Mot. at 10–11. The Court finds, for at least three reasons, that Dr. Hoffman's testimony about the CSG (what it represents and whether Abbott complied with it) is improper and inadmissible.

First, Dr. Hoffman is not an expert in marketing, claims substantiation, or Abbott's internal practices. When asked at his deposition what qualified him to interpret the CSG, he answered his "research education." Hoffman Dep. at 88–89. Dr. Hoffman's education, however, is in human nutrition, epidemiology, and cell biology. Hoffman Report at 104. He thus lacks "educational background or training in [the] relevant field." *Crown Cork & Seal Co. Master Ret. Tr. v. Credit Suisse First Bos. Corp.*, No. 12 Civ. 5803, 2013 WL 978980, at *2 (S.D.N.Y. Mar. 12, 2013) ("*Crown Cork*"). He is not qualified to testify as to whether the standards Abbott set out in its CSG are mandatory or "merely aspirational." Hoffman Report at 2. Nor does he have any basis to opine that claims by Abbott that did not accord with its internal standards were "ineligible to be used to support marketing claims." *Id.* at 2–3. Hoffman is also not qualified to testify about "Abbott's core values," or the "responsibility" of an Abbott employee. *Id.* at 12, 17. These topics, bearing on internal corporate governance, are far afield from Dr. Hoffman's area of scientific expertise. *See, e.g.*, *Serrano v. City of New York*, No. 15 Civ. 6885, 2022 WL 2529547, at *3–4 (S.D.N.Y. July 7, 2022) (finding expert "qualified to

20

testify as to portions of his proffered testimony but not others" because he does not have

"specialized training . . . in support of his conclusions"); *Loyd v. United States*, No. 8 Civ. 9016,

2011 WL 1327043, at *4–5 (S.D.N.Y. Mar. 31, 2011) (similar).

Second, the CSG's guidance, if relevant at trial, would not be "beyond the ken of the

average juror" to grasp. *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994). Jurors are

capable of understanding, without an expert's testimony, the propositions in the CSG that a

health claim must be substantiated by the "totality of the evidence," which "includes weighing

the quality of all available evidence," including that which is "contradictory." CSG at 3591.

Jurors are also capable of understanding the concept of "bridging studies," which ensure "the

relevance of the results to a different population" from the one tested. *Id.* at 3953. These

concepts, which are stated in the CSG in plain language and supported by visual aids, do not

require expertise. *See e.g.*, *Wells Fargo Bank, N.A. v. U.S. Life Ins. Co.*, No. 22 Civ. 8606, 2025

WL 2220948, at *22 (S.D.N.Y. Aug. 4, 2025) (excluding expert testimony where testimony

would not "provide[] background to jurors on unfamiliar topics," and the evidence was

"straightforward and understandable by a layperson"); *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00

Civ. 7242, 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002) (same, where report "does not

address technical questions that may be difficult for a juror to comprehend"); *United States v.

Mejia*, 545 F.3d 179, 195 (2d Cir. 2008) (expert testimony erroneously admitted where based on

records that could have been introduced through "lay witness testimony" and "intelligently

interpreted and understood" without expert explanation (cleaned up)).

Third, Dr. Hoffman's proposed opinion testimony that Abbott failed to comply with the

CSG's ostensibly mandatory guidance is not the province of an expert. Dr. Hoffman envisions

testifying to these shortcomings based on his review of Abbott's internal emails, correspondence

21

from the FTC, and its employees' deposition testimony. *See* Hoffman Report at 5–16. The Court has not had occasion to resolve whether there is a proper place, in trying Noriega's claims, for evidence about the standards set by the CSG. Noriega to date has not so shown, although such will presumably be a subject of *in limine* motions.[7] But assuming the relevance of such evidence, a jury does not need an expert to opine on whether, based on emails and other writings, Abbott strayed from these standards. Dr. Hoffman's opinions drawn from these records are "arguments . . . about questions of fact masquerading behind a veneer of technical language." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 554 (S.D.N.Y. 2004) ("*In re Rezulin*"); *see also Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (expert testimony "cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence"). Such testimony is improper. *See, e.g., In re Rezulin*, 309 F. Supp. 2d at 554 (precluding expert testimony based on review of "in-house documents, memos and emails"); *AU New Haven, LLC v. YKK Corp.*, No. 15 Civ. 3411, 2019 WL 1254763, at *24 (S.D.N.Y. Mar. 19, 2019) (precluding expert testimony based on internal documents, because "[s]uch a narrative, unmoored from the personal experience of the speaker, is reserved for closing argument"); *Hayden v. Int'l Bus. Machines Corp.*, No. 21 Civ. 2485, 2025 WL

---

[7] In defending Dr. Hoffman's testimony on this point, Noriega depicts the CSG as a "corporate mandate" imposed by Abbott on all employees, citing deposition testimony and the CSG's use of imperative language. Hoffman Opp'n at 14. She suggests that Abbott's failure to meet internal guidance makes it more likely that Abbott knowingly and intentionally misled consumers as to the existence of clinical proof. But scienter, although an element of statutory and common-law fraud, is not an element of a claim under GBL §§ 349 and 350. *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 168 (S.D.N.Y. 2014). Noriega's argument that the CSG bears on the meaning of clinical proof is also unavailing. *See* Oral Arg. Tr. at 103–04. Abbott's internal documents are not representative of how a reasonable consumer would understand that term. Because Dr. Hoffman's opinions about the CSG have not been shown to "relate to any issue in the case," they are "not relevant, and ergo, non-helpful." *Daubert*, 509 U.S. at 591; *see also Crown Cork*, 2013 WL 978980, at *4 (requiring "valid connection between the expert's testimony and the issues to be determined by the jury").

1697021, at *9 (S.D.N.Y. June 17, 2025) (party may not offer argument about import of lay evidence "under the guise of an expert opinion").[8]

    *b.*    *Reliability of Dr. Hoffman's Analysis of Abbott's Studies*

Abbott argues that Dr. Hoffman employed an unreliable methodology in finding Abbott's studies of PediaSure unsound. According to Abbott, Dr. Hoffman invented and applied a "29-requirement test" which has never been used in the scientific community or outside this litigation, and ignored evidence contrary to his conclusions. Hoffman Mot. at 5–9.

Abbott's argument rests on a false premise. It is not correct, as Abbott portrays, that Dr. Hoffman created a "29-requirement test" and put aside any study as "scientifically meaningless" if it failed to meet "any one of the 29 requirements," even if it "satisfied 28 of the 29 elements." *Id.* at 3. Dr. Hoffman enumerated scientific standards drawn from reputable sources that bear on whether a study was "conducted objectively, reliably, accurately, and ethically," and assessed whether Abbott's studies met those standards. Hoffman Report at 22–23. He did not, however, anywhere state that a study must satisfy every one of these standards, or any fixed share of them, to be reliable. *See* Hoffman Dep. at 235–36 ("It's a framework and it's not a checklist. The more that they fulfill, the more rigor there is to that study."); *id.* at 236 (agreeing that "there's no clear line or no number of factors that a study has to meet" to be "highly rigorous"). His conclusion—that Abbott's studies were "simply not rigorous enough" to support the challenged statement because they complied with "none" or "very few" of these standards—reflects this approach. *Id.* at 237–38.

---

[8] Hoffman's proposal to testify about what "Abbott expects" or its employees "knew," Hoffman Report at 2, 14, 19, is independently improper because "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *In re Rezulin*, 309 F. Supp. 2d at 546–47 (excluding testimony about "states of mind of corporations, regulatory agencies and others").

A fair-minded review of Dr. Hoffman's report supports the reliability of his methodology in evaluating Abbott's studies. He drew upon his experience (both as a researcher in the field of pediatric growth and nutrition, and as an editor of scientific journals) and academic articles about standards applicable to clinical studies, randomized trials, and medical research involving human subjects. Hoffman Report at 94–98; *see also id.* at 10 ("I routinely perform these reviews as part of my professional responsibilities . . . ."). These are familiar bases for admissible expert testimony. *See, e.g., In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 290 (E.D.N.Y. 2007) (expert's opinion "that available scientific data do not establish a causal relationship" was supported by "distinguished career" in clinical research and experience as reviewer for leading journals in relevant medical field); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 421–22 (S.D.N.Y. 2016) ("*Mirena I*") (admitting testimony based on expert's "education, training, experience, and [] review of the medical literature," where expert cited "several publications to support her view"); *Vazquez v. City of New York*, No. 10 Civ. 6277, 2014 WL 4388497, at *12 (S.D.N.Y. Sept. 5, 2014) (admitting expert testimony based on "personal experience" and "review of academic literature").[9]

Abbott's other arguments do not require exclusion of Dr. Hoffman's testimony.

First, Abbott argues that Dr. Hoffman's methodology is unreliable because it has "never" before been tested or used in the scientific community. Hoffman Mot. at 5. But that argument is based on Abbott's distortion of Dr. Hoffman's report as erecting a novel 29-requirement test. His actual approach, which involves applying reputable scientific literature to Abbott's studies and drawing on his experience in doing so, is not sensibly evaluated by use of the *Daubert*

---

[9] Notably, Abbott's own nutrition expert, Dr. Heyman, offers opinions as to much the same topics based only on his experience (without reference to academic authorities).

24

factors applicable to novel scientific theories. *See Liriano v. Hobart Corp.*, 949 F. Supp. 171, 177 (S.D.N.Y. 1996) ("not appropriate to invoke the *Daubert* test" for expert testimony based on experience and training, because "the *Daubert* analysis applies to cases involving unique, untested, or controversial methodologies or techniques").

Second, Abbott argues that Dr. Hoffman overlooked evidence contrary to his conclusions. Ingersoll Mot. at 8. It faults Dr. Hoffman for failing to consider its AL-48 study. *Id.* But that study, which was completed in 2024—a year after this lawsuit was filed and after the end of the putative class period—cannot be used to support Abbott's challenged labelling, which was in place in 2020. Abbott also faults Dr. Hoffman for errantly ignoring or downplaying portions of Abbott's studies that contradict his conclusions. *Id.* at 8–9. That critique is fair ground for cross-examination, but it does not support preclusion of Dr. Hoffman's testimony. A "minor flaw in an expert's reasoning" does not render testimony "*per se* inadmissible"; a court should only exclude testimony "if the flaw is large enough that the expert lacks good grounds" for his conclusions. *Amorgianos*, 303 F.3d at 267. If Dr. Hoffman was incorrect as to particulars such as whether Abbott's studies conducted baseline height assessments, or reported sample size calculations, such is not a flaw "so glaring as to render his opinion unreliable or inadmissible." *Mirena I*, 169 F. Supp. 3d at 465–66 (expert's "failure to discuss" contradictory evidence "goes to the weight, not the admissibility, of his testimony").

c.    *Relevance of Dr. Hoffman's Opinions on Abbott's Studies*

Abbott next argues that Dr. Hoffman's opinions as to the scientific rigor of Abbott's studies are irrelevant because they are based on "academic publication standards" that do not bear on Noriega's GBL claims. Hoffman Mot. at 7–8. But Dr. Hoffman's report sets out standards that must be satisfied for a study to be considered "transparent," "objective,"

"scientifically vetted," "scientifically rigorous," and "unbiased." *See* Hoffman Report at 24–44. Few of the 36 journal articles on which Hoffman relies in support of those standards appear to relate to "academic publishing," and even those appear to be generally applicable. Hoffman Report at 94–98. That Dr. Hoffman's analysis of Abbott's studies tracks analyses he conducts in his editorial roles is no impediment to the admissibility his testimony.

### d.    *Opinions Not Stated in Expert Report*

Abbott seeks to preclude Dr. Hoffman's opinions related to (1) Abbott's compliance with FTC health claims guidance and (2) how a reasonable consumer would interpret the challenged statement. Hoffman Mot. at 12–16. Abbott notes that these opinions were not disclosed in Dr. Hoffman's report, in violation of Federal Rule of Civil Procedure 26, requiring preclusion under Federal Rule of Civil Procedure 37. *Id.*

Abbott is correct. Rule 26 provides that an expert report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Rule 37, in turn, states that, if a party fails to provide information required by that rule, "the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "[I]t is well-established that expert testimony exceeding the bounds of the expert's report is excludable." *Lugo v. City of New York*, No. 14 Civ. 7185, 2018 WL 11466167, at *1 (S.D.N.Y. July 13, 2018).

It was in his deposition that Dr. Hoffman articulated for the first time his opinions about Abbott's compliance with FTC guidance and consumers' perceptions of the challenged statement. Hoffman Dep. at 52. Noriega does not contend that these opinions were disclosed earlier or justify the failure to do so. The Court thus cannot find their nondisclosure substantially justified. *See Fordec Realty Corp. v. Travelers Excess & Surplus Lines Co.*, No. 18 Civ. 85,

26

2019 WL 3817213, at *2 (S.D.N.Y. Aug. 14, 2019) (where proponent "provided no valid reason why the reports were not provided, its failure is not substantially justified or harmless"). And there is no basis to give Dr. Hoffman leave to amend his report to include such opinions, because they are independently inadmissible. Dr. Hoffman's education and experience is in "nutritional sciences and growth," Hoffman Opp'n at 17; he is therefore unqualified to opine on FTC compliance or consumer perception. *See Nimely v. City of New York*, 414 F.3d 381, 339 n.13 (2d Cir. 2005) (merely "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields").

Because Noriega failed to timely disclose Dr. Hoffman's opinions on FTC compliance and consumer perception, and because they are independently inadmissible, the Court excludes such testimony. *See, e.g.*, *LaSalle Bank Nat. Ass'n v. CIBC Inc.*, No. 8 Civ. 8426, 2012 WL 466785, at *9 (S.D.N.Y. Feb. 14, 2012) (expert cannot offer opinions not disclosed in report, which "operates to limit the scope of the testimony that can be elicited from the expert"); *Venkataraman v. Kandi Techs. Grp., Inc.*, No. 20 Civ. 8082, 2025 WL 2770640, at *5 (S.D.N.Y. Sept. 26, 2025) (excluding untimely-disclosed expert testimony where proponent's justification for delay was "halfhearted and unpersuasive"); *U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 132 (S.D.N.Y. 2015) (excluding testimony where proponent "failed to demonstrate" that it was "disclosed in . . . expert report").

       *e.*       *Overall Assessment*

The Court therefore grants Abbott's motion to exclude Dr. Hoffman's testimony as to the CSG, consumer perception, and FTC compliance. The Court denies the motion with respect to the balance of Dr. Hoffman's testimony, which largely relates to Abbott's studies. *See, e.g., In*

*re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d at 290; *Mirena I*, 169 F. Supp. 3d at 421;

*Vazquez*, No. 2014 WL 4388497, at *12.

> **D.      Abbott's Motion to Preclude Dr. William Ingersoll**

Dr. William Ingersoll's expert report assesses whether purchasers paid a premium

attributable to the challenged statement. Ex. 7 ("Ingersoll Report"). On January 13, 2026,

Abbott moved to exclude Dr. Ingersoll's testimony in its entirety. Dkts. 85–86 ("Ingersoll

Mot."). On February 10, 2026, Noriega opposed. Dkt. 93 ("Ingersoll Opp'n"). Noriega

attached a declaration by Dr. Ingersoll that responded to Abbott's motion. Dkt. 94.[10] On

March 3, 2026, Abbott replied. Dkt. 102 ("Ingersoll Reply").

> **1.      Qualifications, Methodology, and Opinions**

Dr. Ingersoll is an associate professor and chair of business and entrepreneurship at

Azusa Pacific University, where he teaches courses in industrial organization, econometrics, and

microeconomic theory. Ingersoll Report ¶¶ 8–9. He earned a PhD and master's degree in

economics from the University of Arizona. *Id.* at 32. He represents that he has testified as an

economic damages expert in a variety of state and federal cases. *Id.*

Dr. Ingersoll was retained by Noriega to test whether consumers paid a price premium

based on the challenged statement. *Id.* ¶ 15. To do so, he used a choice-based conjoint survey—

a design intended to estimate the value that consumers place on specific product characteristics.

*Id.* ¶ 17. In a conjoint survey, respondents are shown hypothetical products with a list of

attributes (*e.g.*, size, color, flavor, and price) and asked to choose between them. *Id.* ¶ 20. For

example, in a study of almond packaging, one question could require respondents to choose

---

[10] On March 3, 2026, Abbott moved to strike Dr. Ingersoll's declaration as unauthorized.
Dkts. 100–01. On March 17, 2026, Noriega opposed. Dkt. 112. On March 19, 2026, Abbott
replied. Dkt. 115. Because the Court finds Dr. Ingersoll's testimony inadmissible regardless, it
does not have occasion to resolve whether to strike the declaration.

between the following three products: (1) a 6 oz yellow package of sweet cinnamon almonds for $4.99; (2) a 4 oz red package of sweet cinnamon almonds for $3.99; and (3) a 6 oz red package of smoked almonds for $4.99. *Id.* ¶¶ 20–21. Based on a series of choice tasks such as this one, such a survey seeks to reveal the attributes that consumers prefer and by how much. *Id.* ¶ 17.

Here, 383 respondents provided quality responses to the survey, which was conducted in a double-blind fashion (*i.e.*, neither respondents nor those administering the survey knew its purpose). *Id.* ¶ 26. Respondents were New York residents who either purchased or had considered purchasing PediaSure's children's nutritional drinks for their households in the last 12 months. *Id.* ¶ 24. The survey tested seven attributes: brand, form, fiber, label statement, flavor, number of servings, and price. *Id.* ¶ 35. Relevant here, the survey tested the value assigned to three different labels: (1) "Clinically Proven to Help Kids Grow;" (2) "Help Kids Grow"; and (3) no statement. *Id.* ¶ 39.

Dr. Ingersoll sought to measure the dollar value associated with the attributes by testing six price levels, ranging from a minimum price per serving of $1.10 and a maximum of $2.60. *Id.* ¶ 42. Dr. Ingersoll set the price levels based on data regarding PediaSure sales in New York during the class period. *Id.* Respondents were assigned 12 tasks, each of which contained three different hypothetical products for them to choose from. *Id.* ¶ 47. Below is a sample selection screen:

Please imagine you are at the store shopping for children's nutritional beverages. You see the following three products on the shelf. Please imagine that these are the only products available and you do not have time to go to another store. Which would you most likely choose?

(1 of 13)



| Brand | PediaSure Grow and Gain | Private Label | Boost Kid Essentials |
|---|---|---|---|
| Fiber Content | 3 grams per serving | 3 grams per serving | 0 grams per serving |
| Label Statement | No Statement | "Clinically Proven to Help Kids Grow" | "Helps Kids Grow" |
| Flavor | Strawberry | Strawberry | Chocolate |
| Form | Powder (Add water) | Liquid (Serving-sized bottle) | Powder (Add water) |
| Number of Servings | 8 per package | 6 per package | 4 per package |
| Total Price and (Price per Serving) | $18.40 total ($2.30 per serving) | $8.40 total ($1.40 per serving) | $8.00 total ($2.00 per serving) |
| | Select | Select | Select |

Given what you know about the market, would you really buy the children's nutritional beverage that you chose above?

| Yes | No |
|---|---|

*Id.* ¶ 45.

Dr. Ingersoll analyzed the survey results using a Hierarchical Bayes estimation, which uses patterns across all respondents to estimate the value consumers assign to each attribute relative to others. *Id.* ¶ 54. He then conducted a market simulation to estimate consumers' willingness to pay for different versions of the product. *Id.* ¶ 94. He found that, when the challenged statement is compared to "Help Kids Grow" (the "growth-only statement"), it is responsible for $0.3888 of the product's per-serving retail price. *Id.* ¶ 98. In other words, in the absence of Abbott's claim of clinical proof, Dr. Ingersoll found, purchasers would have been charged a market price for PediaSure that was $0.3888 lower. *Id.* ¶ 99. He also found that, when

the growth-only statement is compared to no statement, the growth-only statement is responsible for $0.4257 of the product's per-serving retail price. *Id.* ¶ 98. Taking these findings together, Ingersoll concluded that there is a $0.8145 price premium associated with the entire challenged statement, compared to no statement. *Id.* Thus, if the entire statement was deceptive—*i.e.*, the claim of clinical proof plus the claim of growth—then consumers paid a purchase price that was $0.8145 higher than it would have been absent the statement. *Id.* ¶ 7.

Based on this analysis, Dr. Ingersoll proposes to opine that: (1) products bearing the label "Clinically Proven to Help Kids Grow" are on average "more favorably viewed" than ones that state, "Helps Kids Grow", or that make no statement about growth; and (2) consumers are willing to pay more—in the amounts above—for the product bearing the challenged statement than the growth-only statement or no statement. *Id.* ¶ 6.

### 2.    Analysis

Abbott argues that Dr. Ingersoll's testimony should be precluded on three grounds. First, Abbott argues that Dr. Ingersoll's findings are untethered to Noriega's theory of liability, in that he did not test, and his results are not targeted to, the claim that PediaSure helps kids grow *in height*. Thus, it argues, his findings would not be helpful to the jury. Second, Abbott argues that Dr. Ingersoll's survey is irrelevant because it did not test the disclaimer or imagery on the PediaSure label. Third, Abbott argues that the survey is unreliable because it did not account for economic dynamics, such as the price variation across retailers, and did not adequately incorporate supply-side factors. The first two objections, the Court finds, are valid and warrant excluding Dr. Ingersoll's testimony in its entirety. The Court thus does not address the third.

####        *a.        Relevance of Dr. Ingersoll's Survey Results*

Abbott argues that Dr. Ingersoll's survey fails to calculate a price premium keyed to Noriega's theory of consumer deception. Ingersoll Mot. at 5. Because Noriega's theory is that

31

the challenged statement misled consumers to believe that PediaSure promotes height growth, Abbott argues, the survey, to be helpful, needed to "isolate a price premium traceable to Abbott's purported misrepresentation about *height*." *Id.* at 6 (emphasis in original).

Abbott is correct. Dr. Ingersoll's survey tested the premiums attributable to the label statements, "Clinically Proven to Help Kids Grow," and "Helps Kids Grow." But on their faces, those statements do not exclusively concern height. Their references to growth can also—or alternatively—be read to encompass other forms of growth (*e.g.*, weight, body composition, and/or muscular development). Noriega has not claimed that the challenged statement is false or misleading to the extent it refers to growth types other than height. Dr. Ingersoll, however, did not anywhere test whether there is a premium attributable to Abbott's claim related to height growth specifically. His survey did not isolate height. It did not mention height at all. Nor did it test the features which Noriega claims would make a consumer more likely to understand the challenged statement as referring to height growth (the giraffe, tick marks, and "Grow & Gain" label). And it did not test the disclaimer that Abbott claims contextualized the challenged statement.

As a result, Dr. Ingersoll's survey aimed at quantifying price-premium damages does not "fit" Noriega's theory of liability. It wrongly assumed a single construction of the words on the label—the one favoring Noriega's theory—where alternative constructions were available that were not consistent with that theory. On the errant premise that the statement could be read only in the one way that Noriega claims is actionable, it attributed a price premium to that statement. And it compounded the error by airbrushing away aspects of the label that would have contextualized the statement. As such, the survey failed the foundational relevance requirement for a damages report. *See In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 659 (2d Cir. 2016) (expert

32

report on damages "must be evaluated within the context" of plaintiff's theory of liability); *see also In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1024 (C.D. Cal. 2015) ("*ConAgra*") (expert "must be able to isolate the price premium associated with misleading consumers in [the] particular fashion" that aligns with "theory of liability"); *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1051 (C.D. Cal. 2018) (similar).

*ConAgra* is squarely on point and aptly illustrates this methodological deficiency. The plaintiffs there claimed that ConAgra's use of the term "100% Natural" on its cooking oil label misleadingly suggested that the oil did not contain genetically-modified organisms ("GMOs"). 90 F. Supp. 3d at 938. To calculate damages, plaintiffs' expert proposed to calculate the price premium attributable to the "100% Natural" label. *Id.* at 1023. The court twice found the expert's methodology inadequate, because the challenged statement had "many implications" and the model failed to "isolate[] . . . damages associated with plaintiffs' specific theory of liability." *Id.* (quoting *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 578–79 (C.D. Cal. 2014)). The court noted that the expert "made no efforts to segregate the price premium attributable" to consumers' understanding that the challenged claim meant "GMO-free," as opposed to "free of synthetic chemicals" or "free of preservatives." *Id.* at 1024; *In re ConAgra Foods, Inc.*, 302 F.R.D. at 551. Accordingly, it held, his analysis was not "tied to [plaintiffs'] theory of liability." *ConAgra*, 90 F. Supp. 3d at 1023 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 31 (2013)). The same analysis applies here. Like ConAgra's label statement, Abbott's challenged statement has "many implications," and like the expert excluded in *ConAgra*, Dr. Ingersoll myopically

33

treated the price premium as attributable only to the implication (height growth) urged by the plaintiff. [11]

Noriega responds that it was unnecessary for Dr. Ingersoll's survey to test a specific height claim, because the challenged statement is the equivalent of a statement about height to the exclusion of any other meaning. Ingersoll Opp'n at 8–9. On that basis, she likens Dr. Ingersoll's survey to the survey considered in *Famular v. Whirlpool Corp.*, No. 16 Civ. 944, 2019 WL 1254882 (S.D.N.Y. Mar. 19, 2019). There, the plaintiff claimed that the defendant misrepresented the energy efficiency of its washing machines, which it marketed as "ENERGY STAR® compliant," and affixed with the ENERGY STAR® logo. *Id.* at *1. The conjoint survey tested the price premium attributable to the ENERGY STAR® logo. *Id.* at *12. The court found that that survey matched plaintiff's theory of liability because it "isolate[d] the price premium associated with" the logo. *Id.* The court noted that plaintiff's theory of liability was "binary" and "all-or-nothing"—"[w]ithout the logo, plaintiff claims he would not have paid the price premium." *Id.*

That case does not avail Noriega. The term "grow" in the challenged statement is not self-defining. As the record here reveals, and as is contextually apparent, although it certainly

---

[11] *ConAgra*—like many cases the parties cite in addressing Dr. Ingersoll's testimony—arose in the context of a class certification motion under Federal Rule of Civil Procedure 23(b)(3), which requires the court to assess whether "damages are capable of measurement on a classwide basis," and whether plaintiff's proposed damages model "measure[s] only those damages attributable" to plaintiff's theory of liability. *Comcast Corp.*, 569 U.S. at 34–35. The *Comcast* requirement is more demanding than Rule 702, but there is substantial overlap between the two. *See 10110 Grp., LLC v. Mt. Hawley Ins. Co.*, No. 23 Civ. 7179, 2025 WL 415737, at *3 (S.D.N.Y. Feb. 6, 2025) (Rule 702's relevance requirement "means that, among other things, a plaintiff's expert's damages opinion must correspond to the plaintiff's theory of liability" (cleaned up)). And the methodological deficiency here—a failure to isolate the actionable construction of the challenged statement in calculating a price premium—is equally problematic were this case to proceed as an individual or a class action. This body of case law thus applies here.

can be read to refer to height growth, it can plausibly also be read to refer to forms of growth besides height. *See, e.g.*, Ex. N ("Stephan Dep.") at 60 (Abbott's former brand director of PediaSure, testifying that challenged statement "can refer to both height and weight"); Ex. M at 85 (Abbott's director of regulatory affairs, testifying as to the same); Johar Dep. at 138 ("'grow' in the English language can refer to lots of things"). In *Famular*, in contrast, the ENERGY STAR logo had one fixed meaning—that the machine used "approximately 37% less energy and 50% less water than standard models." *Famular*, 2019 WL 1254882, at \*1. A consumer's decision to purchase a washing machine because of that logo was thus the equivalent of a decision to purchase because of an energy-efficiency guarantee. Here, in contrast, the decision to purchase because of the challenged statement is not the equivalent of a decision to purchase because of a height growth guarantee. Accordingly, Noriega's theory of liability is not "binary." Testing the premium attributable to the challenged statement does not isolate the damages attributable to the alleged deception.

It would not have been difficult to design a conjoint survey to test this representation. In cases in which a label was susceptible of multiple meanings, surveys have tested the premium traceable to the meaning the plaintiff claimed was false or misleading. In *Pizzaro v. Sazerac Co.*, No. 23 Civ. 2751, 2025 WL 2682673 (S.D.N.Y. Sept. 18, 2025), for example, the plaintiff claimed that the similar packaging of two Fireball products would mislead consumers to think that both are made with whiskey, when, in fact, one is made with malt. *Id.* at \*1–2. The conjoint survey there, conducted by Dr. Ingersoll himself, tested the price premium attributable to alcohol type (whiskey versus malt), rather than the challenged label. *See* Declaration of William Robert Ingersoll, *Pizzaro v. Sazerac Co., Inc.*, No. 23 Civ. 2751 (S.D.N.Y. Sept. 18, 2025), Dkt. 46-38 at 12. A different expert employed a similar method in *Broomfield v. Craft Brew Alliance, Inc.*,

2018 WL 4952519 (N.D. Cal. Sept. 25, 2018). The plaintiffs there claimed that the packaging of "Kona" beers created the mistaken impression that the beers had been brewed in Hawaii. *Id.* at *1. The conjoint survey tested the premium attributable to brewing location (Hawaii versus Memphis), rather than the challenged label. *Id.* at *17.

Here, Dr. Ingersoll could have tested the price premium traceable to a hypothetical height-growth-specific statement[12] (*e.g.*, "clinically proven to help kids grow in *height*"). Or he could have tested the value that respondents place on various promised health benefits (*e.g.*, height growth compared to weight gain). Either approach might have enabled him to isolate the price associated with the alleged misrepresentation about height. Dr. Ingersoll's failure to do so resulted in a broad conclusion—that consumers are willing to pay more when PediaSure contains the challenged statement—that is not tailored to Noriega's theory of the case nor helpful to a jury tasked with isolating the damages (via a price premium theory) attributable to a misrepresentation about height. This flaw is sufficiently fundamental to require exclusion of his proposed testimony. *See, e.g.*, *EZ Seed*, 2017 WL 3396433, at *10 (excluding expert testimony related to damages calculation that "does not 'fit' with any of the theories of the case, such that it is not relevant or admissible" (quoting *Daubert*, 509 U.S. at 591)); *In re POM Wonderful LLC*, 2014 WL 1225184, at *5 n.7 (C.D. Cal. Mar. 25, 2014) (excluding testimony, under *Daubert* and *Comcast*, where expert failed to isolate what percentage of "price difference was attributable to [defendant's] alleged misrepresentations"); *see also Price v. L'Oreal USA, Inc.*, No. 17 Civ. 614,

---

[12] Testing hypothetical products is central to the design of conjoint surveys. *See, e.g.*, *Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373, 458 (E.D.N.Y. 2022) (admitting conjoint survey that tested difference between hypothetical eyeglasses); *Zakaria v. Gerber Prods. Co.*, 2017 WL 9512587, at *10 (C.D. Cal. Aug. 9, 2017) (admitting conjoint survey that "presented respondents with several hypothetical product packages, with corresponding, hypothetical prices"), *aff'd*, 755 F. App'x 623 (9th Cir. 2018).

2021 WL 4459115, at *5 (S.D.N.Y. Sept. 29, 2021) (damages methodology "not consistent with Plaintiffs' theory of injury" where challenged claim tested in combination with unchallenged claim, such that "the analysis does not tell" whether respondents paid a premium because of one or the other); *Hughes v. The Ester C Co.*, 317 F.R.D. 333, 356 (E.D.N.Y. 2016) ("problems" with expert report "obvious" where proposed damages model "fail[s] to isolate" alleged misrepresentation in challenged statement, which could be interpreted "differently based on the surrounding context").

    *b.*   *Reliability of Dr. Ingersoll's Survey Methodology*

  Abbott argues that Dr. Ingersoll's conclusions are separately irrelevant because the survey he used showed a "truncated version of the challenged statement" which excluded the footnote disclaimer. Ingersoll Mot. at 8–9. That critique, too, is valid, and supports preclusion of Dr. Ingersoll's survey.

  Dr. Ingersoll's failure to test the disclaimer undermines the reliability of his conclusions as to the price premium attributable to the challenged statement. As Abbott notes, the disclaimer supplies context for the statement's claim of clinical proof: a person who read and understood the disclaimer could be alerted to the fact that the evidence of PediaSure's growth benefits "came not in studies of all children but rather those who were 'at risk of malnutrition.'" SJ Mot. at 7–8. Survey respondents who evaluated the challenged statement in light of the disclaimer logically might have been willing to pay less for PediaSure than those who did not discount the statement per the disclaimer.[13] Had Dr. Ingersoll tested the disclaimer, he might have found a lower price

---

[13] Noriega illustrates the point. She testified that she construed the challenged statement to mean there was "scientific proof that this product can actually make a child grow in height," and that such proof entailed examining thousands of children in the United States who had consumed the supplement for "a year or two" and "grew more than what they should have." Noriega Dep. at 115. Had Noriega read the disclaimer (which she testified that she did not at the time she purchased PediaSure, *id.* at 105), it might have changed her assumption that PediaSure had been

premium attributable to the challenged statement. *See, e.g., In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, 2017 WL 1196990, at *31 (N.D. Ill. Mar. 31, 2017) (excluding survey that arbitrarily selected product attributes to test in conjoint survey, which potentially "inflate[d]" respondents' willingness-to-pay estimate).

More broadly, Dr. Ingersoll's election not to address the disclaimer in his report is strong evidence of motivated reasoning—of an analysis that was not "reliable at every step," but instead was result-driven. *Amorgianos*, 303 F.3d at 267. Dr. Ingersoll was retained to conduct a survey to measure the premium attributable to the challenged statement. Ingersoll Report ¶ 15. The challenged statement unavoidably includes a footnote (indicated by a dagger, asterisk, paragraph symbol, or section symbol, depending on the packaging) that contains the disclaimer. To be sure, there is no assurance that any particular purchaser read the footnote—and conceivably a study could have taken into account the incidence of purchasers who reviewed the footnote relative to those who overlooked or disregarded it. But Dr. Ingersoll's report does not consider the disclaimer at all. The report treats it as *persona non grata*. It does not supply any explanation for omitting it from the survey. That election—for excluding it cannot seriously be considered inadvertent—strongly suggests an impermissibly result-driven methodology. *See, e.g., Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365, 381 (S.D.N.Y. 2014) (failure to consider relevant evidence "indicate that [expert's] methodology was aimed at achieving one result"); *E.E.O.C. v. Bloomberg L.P.*, No. 7 Civ. 8383, 2010 WL 3466370, at *17 (S.D.N.Y. Aug. 31, 2010) (ignoring contradictory evidence "in order to arrive at a desired conclusion highlights the

---

proven effective in promoting growth in U.S.–based children like her grandson. That in turn might have affected her willingness to purchase the product—in general or at the price charged.

unreliability" of expert's methodology); *Mirena II*, 341 F. Supp. 3d at 251 (expert's "departures from settled and rigorous methodology" suggested "motivated, result-driven, reasoning").

Noriega's arguments to the contrary are unavailing.

First, Noriega argues that the disclaimer is visually and substantively inadequate because it is "on the very bottom of the label," "written in tiny font, in a color that blends into the background," and does not define the terms "malnutrition," "undernutrition," or "at risk." Ingersoll Opp'n at 14–15. There is a proper place for those arguments. At trial, Noriega will be at liberty to argue, as to liability, that the disclaimer was too obscure and/or opaque to effectively correct the misimpression left by the challenged statement. But that justification, which is absent from Dr. Ingersoll's report, does not support Dr. Ingersoll's excluding the disclaimer from the survey and failing to engage with it at all in his report. Dr. Ingersoll (or another expert) could have tested the extent to which consumers saw, reviewed, and understood the disclaimer. That outcome in turn could have been factored into Dr. Ingersoll's price-premium analysis. By omitting the disclaimer based on its purported "inadequacy," *id.* at 15, Dr. Ingersoll assumed the conclusion that a conjoint survey is meant to prove. *See, e.g., Mirena II*, 341 F. Supp. 3d at 241 ("Opinions that assume a conclusion and reverse-engineer a theory to fit that conclusion are . . . inadmissible." (cleaned up)).

Second, Noriega, citing Dr. Ingersoll's deposition testimony and his unauthorized supplemental declaration, argues that including the disclaimer in a conjoint survey would have improperly elevated it in importance, causing "focalism bias." Ingersoll Opp'n at 11, 16. To test the disclaimer, Noriega argues, would have required that the disclaimer be displayed in the same text and font size as the challenged statement. *Id.* at 16. That excuse, again absent from Dr. Ingersoll's report, is convenient, not convincing. Conjoint surveys from other reported cases

39

reveal methods that Dr. Ingersoll could have used to mitigate any focalism bias concern. For example, in *Hasemann v. Gerber Prods. Co.*, No. 15 Civ. 2995, 2024 WL 1282368 (E.D.N.Y. Mar. 25, 2024), which involved a conjoint survey, the expert tested "whether the disclosure would cause consumers to behave differently" by dividing respondents into two groups—one shown the claim with the disclosure, the other shown the claim without it. *See* Expert Report of Stefan Boedeker, *Hasemann v. Gerber Prods. Co.*, No. 15 Civ. 2995 (E.D.N.Y. Mar. 25, 2024), Dkt. 200-11 at 20. Dr. Ingersoll could have taken a similar approach, showing half of respondents the challenged statement with the disclaimer, and the other half the statement without it. Beyond that, there presumably were ways—independent of a conjoint survey—to test Dr. Ingersoll's premise that consumers would have overlooked or not understood the footnote disclaimer. Dr. Ingersoll's untested assertion to this effect does not bespeak rigorous methodology.

### c.    *Overall Assessment*

For the reasons above, the Court finds Dr. Ingersoll's survey methodology unreliable, and its conclusions therefore irrelevant. Because his report entirely relies on that survey, the Court grants Abbott's motion to exclude all of Dr. Ingersoll's testimony. *See, e.g.*, *EZ Seed*, 2017 WL 3396433, at *10; *In re Fluidmaster, Inc.*, 2017 WL 1196990, at *31; *In re POM Wonderful LLC*, 2014 WL 1225184, at *5 n.7.

### E.    **Noreiga's Motion to Preclude Dr. Ran Kivetz**

Dr. Ran Kivetz's expert report assesses whether the challenged statement is material to consumers. Ex. E ("Kivetz Report"). On February 10, 2026, Noriega moved to exclude Dr. Kivetz's testimony. Dkts. 90–91 ("Kivetz Mot."). On March 3, 2026, Abbott opposed. Dkt. 106 ("Kivetz Opp'n"). On March 17, 2026, Noriega replied. Dkt. 114 ("Kivetz Reply").

### 1.     Qualifications, Methodology, and Opinions

Dr. Kivetz is a marketing professor at Columbia Business School, where he teaches courses related to marketing strategy, consumer acquisition and retention, and behavioral economics. Kivetz Report ¶¶ 3, 7–8. He earned his PhD in business from Stanford Graduate School of Business and a master's degree in psychology from Stanford University. *Id.* ¶ 4. His research focuses on buyers' purchasing behavior, survey design, and the effect of product characteristics on purchase decisions. *Id.* ¶ 5. He has published numerous articles on topics related to consumer behavior and decision-making. *Id.* at 37–39. He has achieved recognition for his contributions to consumer research, including from the *Journal of Marketing Research* and Society of Consumer Psychology. *Id.* ¶ 6. He serves on the editorial boards of three journals, evaluating marketing research surveys for publication. *Id.* ¶ 10.

Dr. Kivetz was retained by Abbott to assess whether the challenged statement, as modified by the disclaimer, was a driver of consumers' decisions to purchase and/or pay a price premium for PediaSure. *Id.* ¶¶ 1–2. He conducted an empirical consumer materiality survey to test the effect of the challenged statement on consumers' likelihood of purchasing and willingness to pay for PediaSure, and to ascertain the reasons and motivations driving consumers' purchase of the products. *Id.* ¶¶ 17, 26. Dr. Kivetz randomly assigned 420 respondents, all New York consumers, to two groups. *Id.* ¶¶ 17, 34. The test group was shown a 360-degree interactive image of PediaSure with the challenged statement and the cartoon giraffe with tick marks (the product as it appeared in stores). *Id.* ¶ 18. The control group was also shown an image of PediaSure, but without the challenged statement and the tick marks on the giraffe. *Id.* Respondents were then asked four questions. First, respondents were asked how likely they would be to buy the product, and given six answer choices: (1) definitely would buy; (2) probably would buy; (3) may or may not buy; (4) probably would not buy; (5) definitely

41

would not buy; or (6) don't know. *Id.* ¶ 44. Second, respondents who selected any answer except "don't know" were asked what made them answer the first question as they did, and instructed to type their answer in the text box. *Id.* ¶ 45. Third, those same respondents were asked about "[a]ny other reason or reasons" for their answer to the first question. *Id.* Fourth, all respondents were informed about the typical price range for a package of six bottles of a pediatric nutrition drink ($7 to $17), and asked to indicate the highest price they would be willing to pay for the product that they had been shown. *Id.* ¶ 46. Dr. Kivetz created a "coding frame" to synthesize responses to the second and third questions, which were both open-ended, and had independent blind coders classify respondents' answers accordingly. *Id.* ¶ 64.

Dr. Kivetz drew two conclusions based on the survey's results. First, Dr. Kivetz concluded that the challenged statement did not drive consumers to purchase PediaSure. *Id.* ¶ 63. He found that consumers' purchase intentions were similar across the test and control groups, in that 88.7% of test group participants and 90.4% of control group participants answered that they definitely or probably would buy the PediaSure product that they were shown. *Id.* ¶ 62. He also found that "the vast majority" of the reasons respondents in the test group provided for purchasing PediaSure did not relate to the challenged statement or height growth. *Id.* ¶ 66. Instead, the most common purchase reasons fell into the categories such as the product's nutrition, ingredients, taste/flavor, and brand equity/recognition. *Id.* Dr. Kivetz reported that "only 1.9% of participants" in the test group gave a purchase explanation that could refer to the challenged statement, and "[n]ot a single test group participant" mentioned height. *Id.* ¶ 67. As to the control group, Dr. Kivetz found that no respondents provided, as a reason against purchasing PediaSure, that the product is not clinically proven or does not help with height growth. *Id.* ¶ 68. Second, Dr. Kivetz concluded that consumers are not willing to pay

more for PediaSure when the challenged statement is present compared to when it is absent. *Id.* ¶ 70. The average willingness to pay for test group respondents was $12.94, compared to $12.49 for control group respondents. *Id.*

Based on these findings, Dr. Kivetz opines that the challenged statement is "not a common or material factor in consumers' purchase decisions or willingness to pay" for PediaSure. *Id.* ¶ 71 (emphasis omitted). Dr. Kivetz explains that when a survey "detects no statistically significant difference between the test and control conditions," as was the case here, that implies "a lack of materiality of the isolated variable at issue." *Id.* ¶ 72 (emphasis omitted). He opines: "this immateriality necessarily also means that the alleged price premium is zero." *Id.* (emphasis omitted).

### 2.    Analysis

Noriega moves to preclude Dr. Kivetz's testimony on the grounds that his consumer survey is methodologically unsound; his coding of survey responses lacks any discernable methodology; his opinions are not supported by the survey's results; and he improperly offers legal conclusions.

#### a.    *Reliability of Dr. Kivetz's Survey Design*

Noriega argues that, for three reasons, the design of Dr. Kivetz's consumer survey was unreliable. The Court evaluates these, mindful that objections to the methodology of a survey generally go to the weight, rather than admissibility, of expert testimony. *See Nike, Inc*, 2024 WL 3361411, at *4 ("black letter law that errors in survey methodology 'properly go only to the weight of the evidence'" (quoting *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 228 (2d Cir. 1999) (Sotomayor, J.))). None of Noriega's objections supports that Dr. Kivetz's survey is "so flawed as to warrant exclusion." *Id.*

43

First, Noriega argues that Dr. Kivetz erred in conducting a between-group, rather than within-group, study. Kivetz Mot. at 5. In a between-group study, respondents are shown one product and asked how likely they would be to purchase it. *Id.* In contrast, in a within-group study, respondents are shown multiple products and asked which they prefer. *Id.* Noriega argues that within-group studies "should almost always" be used to assess materiality, because they capture whether respondents prefer a product with a particular characteristic over the product without it, not just whether respondents would be willing to purchase the product with/without the characteristic. *Id.* (quoting Ex. WWWW). But Noriega's only support for this proposition is an unpublished email from a statistician at the Swiss Center for Affective Sciences. *See* Ex. WWWW (Dec. 2023 email on advantages of within-subjects designs). Abbott, in contrast, points to a list of authorities supporting the efficacy of between-group studies in the false advertising context. Kivetz Opp'n at 6 n.2. In addition, there appear to be substantial reasons to design a consumer survey as Dr. Kivetz did. For example, had each respondent been shown two versions of PediaSure—one with the challenged statement and one without it—they likely would have alerted to the characteristic being tested, which might have caused them to focus on the challenged statement in a way that real-world consumers would not. *See id.* at 6–7. Accordingly, even if a within-group study would have been more effective for assessing materiality, Dr. Kivetz's decision to conduct a between-group study did not render his survey unreliable. *See POM Wonderful LLC v. Organic Juice USA, Inc.*, 769 F. Supp. 2d 188, 197 (S.D.N.Y. 2011) (admitting consumer survey in false advertising case that assigned respondents to test group, which saw unaltered product, or control group, which saw product without challenged label).

Second, Noriega claims that Dr. Kivetz's study "suffers from . . . the ceiling effect." Kivetz Mot. at 6. Because approximately 90% of individuals in both the test and control groups stated that they were probably or definitely likely to purchase PediaSure, Noriega argues, there was "no room" to perceive the effect of the challenged statement. *Id.* at 6–7. Insofar as Noriega argues that the surveyed population was flawed because it consisted of consumers who were predisposed to purchase PediaSure (*i.e.*, who had purchased a children's nutrition drink in the past six months or expected to purchase one in the next six months, Kivetz Report ¶ 36), this argument fails. *See, e.g.*, *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984) (proper consumer survey universe is individuals "contemplating a purchase" of product in question); *POM Wonderful LLC*, 769 F. Supp. 2d at 197 (false advertising case, admitting survey of individuals who had "purchased pomegranate juice in the past year or would consider purchasing it"). To the extent that Noriega accepts that the surveyed population was proper but argues that Dr. Kivetz should have designed the survey to mitigate any ceiling effect, that is a valid critique. The survey, for example, could have provided more than six possible answer choices for the question of how likely respondents would be to buy the product, enabling Dr. Kivetz to more finely parse respondents' willingness to purchase. Noriega is free to cross-examine Dr. Kivetz as to these perceived flaws. That his survey might have been better designed, however, does not render it unreliable. *See, e.g.*, *Capri Sun*, 595 F. Supp. 3d at 133 (that "more sophisticated methods could have been used" is "fair ground for cross-examination and critique"); *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 741 (S.D.N.Y. 2011) (although survey was "flawed" and "one might wish" it were designed differently, "these issues are relatively minor").

Third, Noriega argues that Dr. Kivetz's use of open-ended questions "produced incorrect and unreliable data." Kivetz Mot. at 7. Noriega argues that asking respondents about the reasons for their purchase decisions, as Dr. Kivetz did here, elicits "what first comes to a respondent's mind," which is distinct from what was material (*i.e.*, important) to their purchase decision. *Id.* (citation omitted). But several aspects of Dr. Kivetz's survey appear to have enabled it to capture more than the reason that "happens to be top of mind for respondents." *Id.* The survey asked consumers why they were definitely/probably likely or unlikely to buy the product, and instructed respondents to "be specific and include details." *Id.* ¶ 45. It then asked for "any other reason or reasons" for their purchase likelihood, and again instructed them to be specific. *Id.* Respondents were thus prompted to provide a fulsome explanation for their purchase decision—not just the first reason that occurred to them. The survey also asked respondents closed-ended questions in addition to the two open-ended questions. Respondents were asked about their purchase likelihood (which required choosing between six answer choices) and willingness to pay (which required a numeric response). Accordingly, "[t]he questions here do not come close to requiring exclusion of the survey." *Capri Sun*, 595 F. Supp. 3d at 128 ("objections to specific survey questions go to 'the weight of the expert report rather than its admissibility'" (quoting *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 326 (S.D.N.Y. 2019))); *cf. de Lacour v. Colgate-Palmolive Co.*, No. 16 Civ. 8364, 2024 WL 36820, at *5 (S.D.N.Y. Jan. 3, 2024) (excluding consumer survey with questions that failed to "provide respondents with adequate definitions" for ambiguous terms), *appeal dismissed*, 2024 WL 3678389 (2d Cir. May 16, 2024); *In re KIND LLC "Healthy & All Natural" Litig.*, 627 F. Supp. 3d 269, 287 (S.D.N.Y. 2022) (excluding consumer survey with questions that "lead[]

the consumer to select the answer preferred by plaintiffs"), *aff'd sub nom. Bustamante v. KIND, LLC*, 100 F.4th 419 (2d Cir. 2024).

*b.    Reliability of Survey Coding*

Noriega next argues that Dr. Kivetz's methodology for coding the survey responses was unreliable, and that the responses do not support his conclusions. Kivetz Mot. at 8–13. She argues that Dr. Kivetz failed to provide instructions to anonymous assistants, who made "highly subjective" coding decisions, and to keep data that would allow Noriega to determine how each response was coded. *Id.* at 8. But Dr. Kivetz provided the coders with a "coding frame," which contained a list of specific categories in which the responses could be classified. Ex. JJJJ ("Kivetz Dep.") at 123, 132.[14] And Noriega does not dispute that Abbott produced the raw survey data, Kivetz Opp'n at 10, which was also attached to Dr. Kivetz's report, *see* Kivetz Report, Ex. D.7. Noriega accordingly could have, based on the raw data, coding frame, and results, reconstructed how responses were coded. Her objections on this basis are unavailing. *See, e.g., A.V.E.L.A., Inc.*, 364 F. Supp. 3d at 326 (dispute over "mechanism for categorizing [survey] responses" goes to "weight rather than admissibility"); *Gucci Am., Inc.*, 831 F. Supp. 2d at 741 (admitting testimony over objection that "coding led [expert] to over-report"); *Post Univ. Inc. v. Learneo, Inc.*, No. 21 Civ. 1242, 2025 WL 2709370, at *6 (D. Conn. Sept. 23, 2025) (same, over objection that expert's "coding instruction[s] do not provide sufficient guidance to produce reliable results").

---

[14] Noriega argues that Dr. Kivetz "did not review the coding inputs from the coders." Kivetz Mot. at 8. That is misleading. Dr. Kivetz testified that he did not review each individual coding decision, but that he coded the survey responses himself and compared his results against those of the coders. Kivetz Dep. at 129.

Noriega's other objections do not fare better.  She argues that Dr. Kivetz overlooked responses that may have referenced height (*e.g.*, "I think my kids would benefit from using this product"), thus undermining his conclusion that "not a single participant referred to potential increases in height as a reason to purchase."  Kivetz Mot. at 9–10 (quoting Kivetz Report ¶ 22). She also argues that Dr. Kivetz's immateriality conclusion rests on a logical fallacy.  *Id.* at 11.[15] At most, Noriega argues, Dr. Kivetz's findings support a "lack of evidence" that consumers considered the challenged statement—they do not "affirmatively prove consumers did *not* consider" the statement in their purchase decisions.  *Id.* at 12 (emphasis in original).  These critiques supply fertile ground for cross-examination.  They do not, however, suggest that Dr. Kivetz's data and methodology are "simply inadequate to support the conclusions reached," *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005), or "based on assumptions that are so unrealistic and contradictory as to suggest bad faith," *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (citation omitted).  Dr. Kivetz's coding methodology, the Court finds, clears the "minimum requirement for admissibility in this Circuit." *Capri Sun*, 595 F. Supp. 3d at 133.

---

[15] Noriega relies on *Kewazinga Corp. v. Microsoft Corp.*, No. 18 Civ. 4500, 2021 WL 4066597, at *23 (S.D.N.Y. Sept. 1, 2021), which excluded expert testimony based on "several logical fallacies."  But that case does not support Dr. Kivetz's exclusion.  The court there found the proposed testimony was "the prototypical example of the 'ipse dixit' of the expert," because it relied on irrelevant and anecdotal evidence.  *Id.*  Here, in contrast, Dr. Kivetz relies on a methodologically sound consumer survey in drawing his conclusions.  There is thus not so "great an analytical gap between the data and the opinion proffered" to warrant exclusion.  *Id.* (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

### c.     Opinions Based on Caselaw

Noriega argues that Dr. Kivetz's testimony should be excluded insofar as it "offers legal conclusions." Kivetz Mot. at 13. Dr. Kivetz references caselaw once in his report.[16] In support of his statement that the survey he conducted is "routinely used in academic, industry, and litigation settings," he cites cases that accepted his consumer surveys and found that they "conclusively showed that the challenged claims were not material." Kivetz Report ¶ 30 n.15. That discrete testimony is inadmissible for several reasons. First, it is "a general rule [that] an expert's testimony on issues of law is inadmissible." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). Second, such testimony, which serves to reinforce the reliability of Dr. Kivetz's survey method, "runs afoul of the well-established rules of evidence that absent an attack on the veracity of a witness, no evidence to bolster his credibility is admissible." *United States v. Arroyo-Angulo*, 580 F.2d 1137, 1146 (2d Cir. 1978) (cleaned up). Third, reference to courts' approval of Dr. Kivetz's survey approach risks "clouding" the judgment of the jury, "which may give exaggerated weight to a judge's supposed expertise on such matters." *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 141 F. Supp. 2d 320, 323–35 (E.D.N.Y. 2001). Accordingly, the Court excludes the portion of Dr. Kivetz's testimony that references caselaw.

### d.     Overall Assessment

Based on the foregoing, the Court grants Noriega's motion to exclude the limited portion of Dr. Kivetz's testimony that references caselaw, but denies the motion with respect to the rest

---

[16] The section of Dr. Kivetz's rebuttal report related to Dr. Ingersoll's testimony also references caselaw. *See* Ex. H ¶¶ 23 n.36, 33–34, 62 n.97. Because the Court has excluded Dr. Ingersoll's testimony in its entirety, it does not consider the admissibility of these opinions.

of his testimony. *See, e.g., POM Wonderful LLC*, 769 F. Supp. 2d at 200–01; *Nike, Inc.*, 2024 WL 3361411, at *3; *Gucci Am., Inc.*, 831 F. Supp. 2d at 740–41.

**F.      Noreiga's Motion to Preclude Dr. Melvin Heyman**

Dr. Melvin Heyman's expert report assesses whether Abbott's studies support that PediaSure helps kids grow, and whether L.V. grew while consuming PediaSure. Ex. D ("Heyman Report"). On February 10, 2026, Noriega moved to exclude Dr. Heyman's testimony. Dkt. 99 ("Heyman Mot."). On March 3, 2026, Abbott opposed. Dkt. 105 ("Heyman Opp'n"). On March 17, 2026, Noriega replied. Dkt. 111 ("Heyman Reply").

**1.      Qualifications, Methodology, and Opinions**

Dr. Heyman is a professor in the Department of Pediatrics at the University of California, San Francisco School of Medicine ("UCSF"). Heyman Report ¶ 1. He earned his medical degree from the University of California, Los Angeles ("UCLA"); completed a residency in pediatrics at Los Angeles County-University of Southern California Medical Center; and completed a fellowship at UCLA in pediatric gastroenterology and nutrition. *Id.* Since 1981, he has worked in pediatric health and medicine, conducting thousands of clinical visits during his career, many of which addressed children's nutritional needs. *Id.* ¶¶ 2–3. Between 1990 and 2016, Dr. Heyman served as chief of UCSF's pediatric gastroenterology division and organized nutritional support services for pediatric patients. *Id.* ¶ 2. He has held leadership roles on local and national committees, including the American Board of Pediatrics and the American Academy of Pediatrics Committee on Nutrition, and has served as editor-in-chief of the *Journal of Pediatric Gastroenterology and Nutrition*. *Id.* ¶ 5.

Dr. Heyman offers three sets of opinions. First, he opines that there is "ample clinical support for a claim that PediaSure helps kids grow, including in both height and weight." *Id.* ¶ 16. He bases this opinion on an in-depth review of Abbott's studies. For each, he discusses

the study design and conclusions; finds that it is scientifically rigorous; explains his opinion that the study provides evidence that PediaSure helps kids grow; and responds to Noriega's critiques of the study. *Id.* ¶¶ 46–148. He also addresses the AL-48 study, which he opines was a "scientifically rigorous clinical study that affirms . . . the height-related findings of prior PediaSure studies." *Id.* ¶¶ 149–59. Second, Dr. Heyman opines that two studies, which Noriega has contended disprove that PediaSure has height growth benefits, "do not undermine or contradict" clinical support for the challenged statement. *Id.* ¶ 16. He bases this opinion on his review of those studies and the assessments of their authors. *Id.* ¶¶ 174–201. Third, Dr. Heyman opines that L.V. grew in height and weight while consuming PediaSure, and that L.V. was not harmed by his consumption of the same. *Id.* ¶ 16. He bases this opinion on L.V.'s medical records, which Dr. Heyman reviewed to assess L.V.'s "growth, any associated medical concerns, and nutritional status." *Id.* ¶¶ 202–22.

### 2.    Analysis

Noriega argues that Dr. Heyman is unqualified to offer opinions related to pediatric height growth, and that his testimony as to other forms of growth would be unhelpful to the jury. Noriega further argues that Dr. Heyman used an unreliable methodology in reaching his conclusions about the findings of Abbott's studies and their scientific rigor. As to Dr. Heyman's opinions related to L.V.'s growth specifically, Noriega argues that such are irrelevant and not proper expert testimony.

### a.    *Qualifications to Opine on Height Growth*

Noriega argues that Dr. Heyman is unqualified to opine on pediatric height growth because he lacks specialized training or experience in the field. Heyman Mot. at 8. That argument fails. Dr. Heyman has extensive education and experience in pediatric nutrition. He

completed his residency in pediatrics, and a fellowship in pediatric gastroenterology and nutrition; holds a Master of Public Health in nutrition; served as chief of UCSF's pediatric gastroenterology, hepatology, and nutrition division for nearly three decades; and has served as director of the UCSF training program in pediatric gastroenterology and nutrition since 1998. Heyman Report at 130–31. He has been recognized in the field of pediatric nutrition, served in leadership roles of professional organizations related to the same, and served as editor of a journal focused on pediatric nutrition. *Id.* at 131–34. He has authored peer-reviewed publications and books on topics related to children's growth. *Id.* at 180–215.

Although Dr. Heyman does not appear to have expertise in pediatric height growth specifically, that does not render his qualifications inadequate. Courts admit testimony of experts who have "educational and experiential qualifications in a general field closely related to the subject matter in question," but lack expertise in "the specialized areas that are directly pertinent." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007). Dr. Heyman's formidable education and experience thus qualify him to speak about children's height growth—a "closely related" field to pediatric nutrition. His lack of specialization in this niche, at most, goes to the weight of his testimony. *See, e.g., Mirena I*, 169 F. Supp. 3d at 447–48 (admitting testimony of expert in uterine physiology, despite "lack of familiarity with contraceptives," because "lack of specific experience . . . does not warrant exclusion"); *Monterey v. City of New York*, No. 17 Civ. 4477, 2019 WL 5884466, at *4 (S.D.N.Y. Nov. 12, 2019) (admitting board-certified radiologist's diagnosis of sprain because "fields of radiology and orthopedics are closely related").

b.    *Reliability of Dr. Heyman's Methodology*

Noriega argues that, for three reasons, Dr. Heyman's methodology is unreliable. None justifies precluding his testimony in its entirety. But the Court finds one objection—related to Dr. Heyman's discussion of AL-48—valid and accordingly excludes that area of testimony.

First, Noriega argues that Dr. Heyman's analysis is unreliable due to a lack of textual support for his assessment of Abbott's studies. Heyman Mot. at 10–11. But Dr. Heyman's testimony is based on his "extensive and specialized experience." *Scott*, 315 F.R.D. at 50 (quoting *Kumho Tire*, 526 U.S. at 156). His method is thus "the application of experience to the facts," *id.* at 50 (citation omitted), such that his testimony is reliable if he has shown how his "experience . . . led to his conclusion[s]," *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 132 (2d Cir. 2006). Dr. Heyman has done so here. *See, e.g.*, Heyman Report ¶ 36 (opining, based on experience "conducting and reviewing many clinical trials," that funding sources do not undermine reliability of clinical study); *id.* ¶ 43 (opinion that studies of "fragile kids" are applicable to American children "comports with my experience prescribing oral nutritional supplements (including PediaSure) to children"); *id.* ¶ 85 (finding study "scientifically rigorous" because "it is a study that I would consider in my own clinical practice"); *id.* ¶ 199 (opining, based on "experience analyzing clinical studies," that "failure to observe statistically significant improvements should not be interpreted as clinical evidence of no improvements").

That Dr. Heyman "fails to cite to relevant authority," Heyman Mot. at 5, might undermine the strength of his conclusions, but it does not invalidate them. *See, e.g.*, *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) ("lack of textual authority" for expert opinion "go[es] to the weight, not the admissibility, of his testimony"); *Linde v. Arab*

*Bank, PLC*, 922 F. Supp. 2d 316, 321 (E.D.N.Y. 2013) ("Rule 702 does not require that published studies or similar authority unequivocally support the expert's conclusions."). His analysis, which clearly follows from his education and experience, is sufficiently reliable. *See, e.g.*, *SR Int'l Bus. Ins. Co.*, 467 F.3d at 132 (admitting testimony where expert explained how experience in industry and familiarity with practices "led to his conclusion"); *Tang Cap. Partners, LP v. BRC Inc.*, 757 F. Supp. 3d 363, 390 (S.D.N.Y. 2024) (same where expert stated "why his experience provides a reliable basis for his conclusions"); *Lifeguard Licensing Corp. v. Kozak*, No. 15 Civ. 8459, 2017 WL 908199, at *7 (S.D.N.Y. Mar. 7, 2017) (same where report "adequately explain[ed] his analyses and conclusions," and did not "offer credentials rather than analysis" (cleaned up)).

Second, Noriega argues that Dr. Heyman's analysis is unreliable because he failed to rely on the CSG, which constitutes "considerable contradictory evidence." Heyman Mot. at 12–13. As noted, however, the CSG is an internal Abbott document that supplies guidance for substantiating marketing claims. It was unnecessary for Dr. Heyman to consider it in analyzing the findings of Abbott's studies, or whether the studies were scientifically rigorous. And, as discussed above, Noriega has not shown that Abbott's compliance, or lack thereof, with the CSG bears on any element of her claims and thus is relevant. Dr. Heyman's failure to consider a document whose relevance Noriega has not established does not undermine the reliability of his methodology.[17]

---

[17] In light of this critique by Noriega, Dr. Heyman discussed the CSG in his rebuttal report, opining that it was optional, not obligatory, for Abbott to comply with that internal guidance. *See* Ex. G ¶¶ 7–8. Noriega seeks to exclude that opinion. Heyman Mot. at 13. The Court will do so, for the same reasons it has excluded Dr. Hoffman's opposite conclusion that compliance with the CSG was mandatory. Dr. Heyman is not an expert in marketing, claim substantiation, or Abbott's internal practices.

Third, Noriega argues that Dr. Heyman's analysis is unreliable because it is premised on the AL-48 study, which is "unfinished, unwritten, [and] unpublished." Heyman Mot. at 11–12. The Court has found AL-48 not relevant, because it was completed after the time period on which Noriega's claims are based (and after the proposed class period). Accordingly, the Court excludes Dr. Heyman's testimony insofar as it references or relies on that study. *See* Heyman Report ¶¶ 149–59.

> c.      *Relevance of Opinions About Non-Height Growth*

Noriega argues that Dr. Heyman's testimony would be unhelpful to jurors because he "avoid[s] opining on height growth specifically," instead addressing other forms of growth that are "wholly irrelevant" to Noriega's claims. Heyman Mot. at 9–10. This argument is unavailing.

As an initial matter, Dr. Heyman does opine on height growth. His conclusions as to the height findings of Abbott's studies are central to his proposed testimony. *See, e.g.*, Heyman Report ¶ 32 ("each of these studies . . . supports that PediaSure helps children grow in height"); *id.* ¶¶ 58, 71, 87, 101, 182, 191, 199 (studies show PediaSure promotes "increases in height"). In any event, Noriega is incorrect that Dr. Heyman's testimony is irrelevant insofar as it relates to forms of growth besides height. "[T]he testimony of a party's expert must be evaluated within the context of that party's own theory of the case." *Olin Corp. v. Lamorak Ins. Co.*, No. 84 Civ. 1968, 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 18, 2018). Abbott's theory is that the challenged statement means that PediaSure has been clinically proven to help kids grow in height, weight, body composition, head circumference, and other metrics. *See* Heyman Opp'n at 6–7. It is thus relevant whether the studies reviewed by Dr. Heyman do, in fact, support that PediaSure promotes non-height forms of growth. The scope of Dr. Heyman's testimony is not

limited by Noriega's theory of liability. *See, e.g.*, *In re Terrorist Attacks on Sept. 11, 2001*, No. 3 MD 1570, 2025 WL 2383768, at *4 (S.D.N.Y. Aug. 18, 2025) (relevance "[m]easured against the proffering party's theory of the case"); *Conti v. Doe*, No. 17 Civ. 9268, 2020 WL 6162104, at *5 (S.D.N.Y. Oct. 21, 2020) ("relevance of an expert opinion depends primarily on the parties' claims *and defenses*" (emphasis added)); *see also United States v. Rahman*, 189 F.3d 88, 134 (2d Cir. 1999) ("expert testimony may be admitted if the court finds that it will 'assist the trier of fact to understand the evidence or to determine a fact in issue'" (quoting Fed. R. Evid. 702)).

> e.       *Relevance of Opinions About L.V.'s Medical Records*

Noriega argues that Dr. Heyman's testimony related to L.V.'s medical records is irrelevant. Heyman Mot. at 15. Abbott counters that such testimony is relevant for at least three reasons. Heyman Opp'n at 19–20. Because those reasons are unavailing, the Court excludes Dr. Heyman's testimony on this topic. *See Faulkner v. Nat'l Geographic Soc.*, 576 F. Supp. 2d 609, 619 (S.D.N.Y. 2008) ("The proponent of the testimony has the burden to show that it is relevant . . . .").

First, Abbott argues, Dr. Heyman's testimony as to L.V.'s growth is probative of whether the challenged statement is false or misleading. Heyman Opp'n at 19. But even taking as true Dr. Heyman's assessment that L.V. grew while he consumed PediaSure, Heyman Report ¶ 202, such would not make it more likely that PediaSure helps kids grow. There are myriad reasons why L.V. might have grown during the relevant period, such as his genetics, age, diet, sleep, and physical activity. Dr. Heyman does not opine that PediaSure caused L.V.'s height growth, nor could he responsibly do so. *See R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 273 (S.D.N.Y. 2010) ("one cannot determine whether something caused an observed effect without

controlling for other equally plausible causes of that effect"); *Awad v. Merck & Co.*, 99 F. Supp. 2d 301, 304 (S.D.N.Y. 1999) ("a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of Fed. R. Evid. 702" (citation omitted)), *aff'd sub nom. Washburn v. Merck & Co.*, 213 F.3d 627 (2d Cir. 2000). Dr. Heyman's testimony therefore says nothing about the veracity of the challenged statement.

Second, Abbott argues that Dr. Heyman's testimony is relevant because it undermines Noriega's testimony that L.V. did not grow taller during the year he drank PediaSure, thus impeaching her credibility. Heyman Opp'n at 19. If L.V. grew during the relevant period, that fact would be fair game to use to impeach that aspect of Noriega's testimony. But a medical expert is not necessary to establish it. L.V.'s medical records, which reflect the weight and height recorded at his appointments in July 2021 and March 2023, are comprehensible to a layperson. *See* Heyman Report ¶ 203. Abbott has not contended that expert testimony is needed to decode them on this point. Accordingly, such testimony would be improper. *See, e.g., Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989) (expert testimony must not be directed "to lay matters which a jury is capable of understanding and deciding without the expert's help").

Third, Abbott argues that Dr. Heyman's assessment of L.V. would be "important rebuttal testimony" if Noriega claims her grandson was harmed by PediaSure. Heyman Opp'n at 19. Noriega, however, explicitly disavowed that theory of injury, and plaintiffs have not indicated any intention to pursue any such claim at trial. *See* Noriega Dep. at 258–60. Dr. Heyman's testimony as to L.V. is irrelevant.

*f.*      *Overall Assessment*

For the reasons above, the Court grants Noriega's motion to exclude Dr. Heyman's testimony with respect to his opinions as to the AL-48 study and L.V.'s medical records. The Court denies the motion with respect to the balance of Dr. Heyman's testimony. *See, e.g., In re Mirena I,* 169 F. Supp. 3d at 447; *SR Int'l Bus. Ins. Co.,* 467 F.3d at 132; *Tang Cap. Partners, LP,* 757 F. Supp. 3d at 390–91.

## III.    Abbott's Motion for Summary Judgment

### A.      Governing Legal Standards

#### 1.       Summary Judgment

To prevail on a motion for summary judgment, the movant bears the burden of "show[ing] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau,* 524 F.3d 160, 163 (2d Cir. 2008). In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party, *Holcomb v. Iona Coll.,* 521 F.3d 130, 132 (2d Cir. 2008), resolving "all ambiguities" in their favor, *Johnson v. Killian,* 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)). "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

"[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the

nonmoving party's claim." *Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir. 1991). If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord,* 554 F.3d 255, 266 (2d Cir. 2009).

### 2.    GBL §§ 349 and 350

GBL §§ 349 and 350 prohibit consumer deception and false advertising. GBL § 349 prohibits "deceptive . . . acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. GBL § 349(a). GBL § 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. GBL § 350.

To establish a claim under either statute, a plaintiff must show that "a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.,* 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.,* 18 N.Y.3d 940, 944 (2012)).

### B.    Analysis

Abbott moves for summary judgment on three grounds. First, it argues, Noriega has not adduced evidence that the challenged statement is likely to mislead a reasonable consumer.

59

Second, it argues, Noriega has not adduced evidence that the challenged statement would be material to a reasonable consumer in deciding whether to purchase PediaSure. Third, it argues, Noriega has not adduced evidence that she was injured as a result of the challenged statement.[18]

### 1.    False or Misleading

In assessing whether the alleged act is false or misleading, the New York Court of Appeals employs an objective test, which asks whether the act would "be likely to mislead a reasonable consumer acting reasonably under the circumstances." *Orlander*, 802 F.3d at 300 (cleaned up). This standard "requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Bustamante*, 100 F.4th at 426 (citation omitted).

The Court finds that Noriega has adduced sufficient evidence to permit a rational juror to find that a reasonable consumer would have been misled by the challenged statement. This evidence would permit the factfinder to conclude that (1) a significant portion of consumers would understand the challenged statement to refer (at least in part) to height growth, and (2) the statement's claim as to clinical proof of height growth was unsubstantiated, either because Abbott's studies do not support that PediaSure promoted height growth in the relevant

---

[18] Some of Abbott's arguments presuppose the exclusion of testimony by Noriega's experts or contend, on grounds tracking *Daubert* motions by Abbott that the Court has largely denied, that such testimony is unreliable or non-probative. To the extent Abbott so argues, its motions fail. *See Figueroa v. Bos. Sci. Corp.*, 254 F. Supp. 2d 361, 369 (S.D.N.Y. 2003) (rejecting summary judgment argument premised on inadmissibility of expert testimony found admissible); *George v. Thomas*, 888 F. Supp. 41, 43 (S.D.N.Y. 1995) (expert testimony "may well be subject to attack on the ground that she lacks an adequate basis," but "this is not an appropriate basis upon which to grant summary judgment"); *Ramirez v. Avery Berkel, Inc.*, No. 2 Civ. 6887, 2004 WL 3741743, at *9 (S.D.N.Y. Mar. 17, 2004) ("purpose of a motion for summary judgment is not to delve into the reliability of the methods and procedures employed" by proposed expert).

population (New York children), or because such studies do not support that PediaSure promoted height growth at all.

Admissible evidence to this effect includes the following.

***PediaSure Packaging & Commercials***:  Under GBL §§ 349 and 350, a challenged statement must be viewed "in light of the context of the whole label or advertisement." *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 466 (S.D.N.Y. 2020).  Here, a rational juror could find that PediaSure's packaging, viewed as a whole, communicates that the product helps children grow taller.  The wording of the challenged statement—"Clinically Proven to Help Kids Grow"—is unspecific as to the type of growth the product promotes.  But the imagery alongside it supplies a strong basis, to say the least, on which a reasonable consumer could read Abbott to make a representation about height growth.  The central image on the bottle is of a cartoon giraffe—the animal well-known as the tallest of all mammals.  *See* Lory Herbison & George W. Frame, *Giraffe*, Encyc. Brittanica, https://www.britannica.com/animal/giraffe.  The giraffe appears next to vertical tick marks resembling a ruler that climb to the level of the giraffe's head. There is no comparable horizontal imagery.  And the words "Grow & Gain" appear in large font below the brand name.  These features could readily support a consumer's conclusion that the word "grow" in the challenged statement refers to height growth, with the word "gain" referring to weight gain.  *See, e.g., Brockington v. Dollar Gen. Corp.*, 695 F. Supp. 3d 487, 504–05 (S.D.N.Y. 2023) (noting "context is crucial" in deceptive labeling case, and considering how consumer would perceive challenged claim in light of imagery on label (quoting *Fink v. Time Warner*, 714 F.3d 739, 742 (2d Cir. 2013)); *Cooper v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 96 (S.D.N.Y. 2021) (same).  Abbott would be at liberty at trial to press the opposite

inference: that the PediaSure packaging does not convey a message about height growth. But these features, standing alone, easily give a basis on which to find otherwise.

A factfinder could further find that the words and images in Abbott's commercials reinforced the message to consumers that PediaSure is a means to promote height. The "worried mom commercial" depicts a child shorter than the children next to him. His mother states that she was "concerned that he was behind in growth"; displays the word "growth" above an image of a child standing alongside vertical tick marks; and, in the final scene, shows the child (who has begun drinking PediaSure) reaching up to erase a classroom white board. *See* Ex. HH. The "basketball commercial" depicts a child standing between two taller children, who are meant to be his older brothers. The child states that he has "got a lot to look up to" and that his mother was "concerned about [his] growth," and the commercial depicts the mother measuring the child's height against a doorframe. *See* Ex. II. A factfinder could find that these commercials, like PediaSure's packaging, would lead a reasonable consumer to conclude the product promotes height growth.[19]

***Dr. Johar's Report***:  A factfinder could also credit Dr. Johar's expert assessment—which the Court has held admissible—of how a reasonable consumer would understand the challenged statement. She opines, based on the giraffe imagery and words "Grow & Gain" that consumers

---

[19] A juror could further find that Abbott records and employee deposition testimony support the conclusion that a reasonable consumer would take away from PediaSure's packaging and marketing that it promotes height growth. Abbott's "2015 PediaSure HCP Strategy" slide deck, which discusses how the giraffe concept performed in a packaging study, includes these quotes from respondents: "Measuring tape image makes it clear this product helps with growth," and "The giraffe is cool and he's an example of what the product does for growing." Ex. W at 92190. And Kevin Stephan, who was Abbott's brand director of PediaSure, testified that Abbott's marketing team sought to "include height within the definition [of growth] to better define the segments of growth." Stephan Dep. at 262. This evidence aligns with Noriega's testimony that, based on the PediaSure commercial, she concluded that the product would help a child grow taller. Noriega Dep. at 48–49.

will understand the statement to mean that PediaSure has been clinically proven to help kids grow in height. Johar Report at 7. She further opines that the PediaSure commercials, with their images of a child shorter than his peers and a mother measuring her child's height, reinforced this point. *Id.* at 15–16. As to the footnote disclaimer to the effect that Abbott's clinical proof was based on studies of "children at risk for malnutrition," she opines that consumers would be unlikely to notice the superscript in the challenged statement, and that, even if they noticed and read this "small print," they are "unlikely to correct their initial belief that PediaSure is clinically proven to help kids grow in height." *Id.* at 7. At trial, Abbott will be at liberty to attempt to rebut these conclusions, but a rational juror could credit Dr. Johar's assessment of consumers' likely takeaways.

***Dr. Hoffman's Report***: Dr. Hoffman's report assesses whether Abbott's studies support its labelling claim that PediaSure is clinically proven to help kids grow, to the extent that that claim is read to refer to growth in height. He opines that the studies were not objective or reliable for multiple reasons. These include that they were not double-blind or randomized-controlled, did not have height growth as a primary outcome, and did not conduct pre-enrollment baseline height measurements. *See generally* Hoffman Report at 44–91. For example, he opines, some studies did not compare PediaSure to a calorically equivalent food, instead giving the test group PediaSure and the control group nothing. *Id.* at 47, 62. Dr. Hoffman further concludes that, to the extent the studies claimed to have found height benefits to consuming PediaSure, they could not provide clinical proof that PediaSure leads to height growth in the relevant consumer population. The studies, he emphasizes, were conducted on populations dissimilar to New York children (to whose parents and caregivers Abbott marketed PediaSure), such as severely malnourished children in Pakistan or Peru, undernourished children in the

63

Philippines and Taiwan, and chronically disabled children in the United States. *Id.* Given the idiosyncratic and "extremely narrow population[s] studied," Dr. Hoffman opines, these studies are "not generalizable." *Id.* at 65; *see also id.* at 53, 81, 86, 90. A rational juror could credit his testimony, and find unsubstantiated (and hence false or misleading) the statement or implication in PediaSure's packaging that height benefits to relevant populations were clinically proven.

Abbott makes a series of counterarguments. But these do not disturb the conclusion that the admissible evidence, viewed in the light most favorable to Noriega, creates genuine issues of material fact as to whether PediaSure's packaging was likely to mislead a reasonable consumer.

First, Abbott argues, Noriega cannot show that the challenged statement refers exclusively to height growth. The statement, it notes, reads, "Clinically Proven to Help Kids Grow"—not "Clinically Proven to Help Kids Grow In *Height*." SJ Mot. at 7 (emphasis added). That argument attacks a straw man. To prevail on her claims, Noriega need not show that a reasonable consumer would understand the challenged statement to refer only to height growth. Provided that Noriega establishes that the challenged statement would be understood as in part a claim about height growth, such could still constitute deception under GBL §§ 349 and 350, were the jury to find that PediaSure's height growth benefits were not backed, as claimed, by clinical proof. *See, e.g., Segovia v. Vitamin Shoppe, Inc.*, No. 14 Civ. 7061, 2017 WL 6398747, at *4 (S.D.N.Y. Dec. 12, 2017) (summary judgment for defense improper on misleading element of GBL claims; although the allegedly deceptive statement was partially true, a "reasonable consumer could be mistakenly led to believe" that the product contained an additional attribute it lacked (emphasis omitted)). Were the jury to so find, the existence of clinical proof that the product promoted other growth (*e.g.*, weight growth) would not require entry of judgment for Abbott.

Second, Abbott argues that any misconception resulting from the challenged statement is remedied by the footnote disclaimer, which states, in its various forms, that PediaSure was "Studied in children at risk for malnutrition"; "Studied in children at risk for malnutrition, 2 servings per day," or "Studied in children with and/or at risk for undernutrition, 2 servings per day." JSF ¶ 8. That disclaimer, Abbott argues, "makes clear the clinical proof came in not studies of all children," but of specific populations. SJ Mot. at 7–8.

That argument is fairly made—but it is properly directed to the jury. The presence of a disclaimer "may defeat a claim of deception." *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013). Or it may not: the efficacy of a disclaimer quintessentially turns on context. It may turn on the disclaimer's appearance ("font size, placement, and emphasis") and/or its substance (whether it "dispel[s] the misleading impression created" by the label). *Henry v. Nissin Foods (U.S.A.) Co.*, No. 22 Civ. 363, 2023 WL 2562214, at *6–7 (E.D.N.Y. Mar. 17, 2023). A rational jury could find that the footnote disclaimer here was ineffective. It could credit Dr. Johar's testimony to that effect. *See* Johar Report at 12–13 (opining that disclaimer is "not proximate" to challenged statement, "is in small font and hard to read," does not define "at risk" or "malnutrition," and its relevance to challenged statement is "hard to discern"). Indeed, a rational juror examining the packaging for him or herself could so conclude without relying on Dr. Johar's testimony. Such a juror could note that the challenged statement and disclaimer are on opposite sides of the giraffe and that the challenged statement is larger and more prominent than the disclaimer. Such a juror could discount the content of the disclaimer as unilluminating. The disclaimer, the juror could conclude, does not address height specifically and does not explain the implications of the study feature ("studied in children at risk of malnutrition") that it briefly discloses. Alternatively, such a juror could find Abbott's disclaimer adequate and

dispositive. But, viewed in the light most favorable to the non-movant, Noriega, this evidence creates a material dispute as to the efficacy of the disclaimer.

Third, Abbott argues that Noriega's methodological critiques of its studies do not establish the absence of clinical proof supporting the challenged statement. SJ Mot. at 9–11. Abbott is right that "identifying flaws in a scientific study does not necessarily make marketing statements based on such a study false or misleading." *In re Riddell Concussion Reduction Litig.*, 121 F. Supp. 3d 402, 416 (D.N.J. 2015). But a rational juror here could find that the deficiencies identified by Dr. Hoffman are so basic and devastating that Abbott's studies cannot credibly be claimed to constitute clinical proof of the challenged statement.[20] For example, a juror crediting Dr. Hoffman's testimony could conclude that a study finding that PediaSure promotes height growth in a malnourished child in a developing country says absolutely nothing about whether it does the same for a healthy New York City child with a sound diet. Viewing Dr. Hoffman's testimony in the light most favorable to Noriega, a jury could put aside Abbott's

---

[20] *Greifenstein v. Estee Lauder Corp.*, 2013 WL 3874073 (N.D. Ill. July 26, 2013), an out-of-Circuit case on which Abbott relies, is of no avail. The court there rejected the plaintiff's argument that the defendant's claim of clinical proof was false because the defendant "failed to disclose the study's methodology" and "itself funded the study." *Id.* at *4. Here, Dr. Hoffman's testimony identifies flaws in Abbott's studies that a jury could find far more fundamental than an undisclosed methodology or compromised funding source. The Court is unpersuaded by Abbott's suggestion that the nominal existence of a study, even one that could be found wholly inapposite to the proposition at hand, inherently defeats a challenge to a claim of clinical proof. In any event, *Greifenstein* did not consider GBL claims. *Cf. Hidalgo v. Johnson & Johnson Consumer Cos., Inc.*, 148 F. Supp. 3d 285, 297–98 (S.D.N.Y. 2015) (complaint, which brought claim under GBL § 349, plausibly alleged that claim that product was "clinically proven to help babies sleep better" was misleading, where studies allegedly had not tested product alone but instead tested separate three-step routine).

studies as entirely inapposite and thus find an absence of clinical proof that PediaSure helps kids grow in height.[21]

Fourth, Abbott argues that Noriega lacks sufficient evidence to reach a jury on the proposition that a reasonable consumer would perceive the challenged statement to refer to height growth, because she chose not to conduct a consumer survey. SJ Mot. at 12–13. Abbott suggests that, because the challenged statement is impliedly (rather than literally) false, Noriega is required to come forward with extrinsic evidence that the challenged statement would mislead consumers. *Id.* at 13 (quoting *Johnson & Johnson \* Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992)). But "the requirement of extrinsic evidence to prove that implied assertions in ads are false is chiefly a requirement of Lanham Act false advertising claims." *Hasemann*, 2024 WL 1282368, at \*14. GBL §§ 349 and 350 do not have an extrinsic evidence requirement. *Id.* ("In the GBL context, a plaintiff can establish a triable issue of fact as to deceptiveness without extrinsic evidence of consumer perception—even if a statement is only impliedly false."); *see also Classic Liquor Importers, Ltd. v. Spirits Int'l B.V.*, 201 F. Supp. 3d 428, 454 (S.D.N.Y. 2016) (GBL §§ 349 and 350 "are not mere Lanham Act analogues" (citation omitted)). And here, as noted, PediaSure's packaging—including the prominent giraffe and the vertical ruler—would give a jury a solid basis to conclude that a reasonable consumer would take away a message as to height benefits, with or without a study so finding. The absence of consumer survey evidence thus does not support summary judgment.

---

[21] At argument, Abbott noted that Noriega has not adduced evidence specifically as to how a reasonable consumer would construe the words "clinical proof." Oral Arg. Tr. at 75–76. That is a valid point, which Abbott is at liberty to note before the jury. But the absence of such proof is not a basis for entry of summary judgment, because Noriega has adduced sufficient evidence to reach a jury as to how a reasonable consumer would view the challenged statement as a whole.

*See, e.g.*, *Volino v. Progressive Cas. Ins. Co.*, No. 21 Civ. 6243, 2024 WL 1251185, at *9 (S.D.N.Y. Mar. 22, 2024) (denying summary judgment where defendants "identified no legal authority that creates a freestanding requirement that a plaintiff furnish surveys . . . to prevail on a GBL § 349 claim"); *Price*, 2020 WL 4937464, at *10 ("declin[ing] to find that plaintiffs' evidence is insufficient as a matter of law because they do not proffer a consumer survey"); *see also Classic Liquor Importers, Ltd.*, 201 F. Supp. 3d at 454 (denying summary judgment on GBL § 349 claim, but granting summary judgment on Lanham Act claim for lack of extrinsic evidence).

The Court thus finds that Noriega has raised a genuine dispute of material fact as to whether the challenged statement would mislead a reasonable consumer. *See, e.g.*, *Price*, 2020 WL 4937464, at *10 (evidence sufficient to preclude summary judgment where plaintiff offered expert testimony and anecdotal evidence about whether reasonable consumer would be deceived by packaging); *Hasemann*, 2024 WL 1282368, at *12–13 (same, where plaintiff offered evidence of product packaging, advertisements, and defendant's internal communications).

### 2.    Materiality

A misrepresentation is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *Bildstein v. MasterCard Int'l Inc.*, 329 F. Supp. 2d 410, 414 (S.D.N.Y. 2004) (citation omitted).  The Court finds that Noriega has put forward sufficient evidence to permit a rational juror to find that the challenged statement was important to consumers in deciding whether to purchase PediaSure.  It includes the following:

*Dr. Johar's Report*:  Dr. Johar addresses the aspects of PediaSure's packaging that would be material to consumers.  Johar Report at 14–15.  She concludes that the challenged

statement—which she construes to concern height benefits—is the "key reason" for consumers to purchase PediaSure, and that this message is reinforced by other packaging features, including the giraffe imagery, brand name, and label claims related to the drink's vitamin, minerals, and protein content. *Id.* at 14. She concludes, based on her experience, that the challenged statement is "material" to consumers' decision to purchase PediaSure. *Id.* at 15. A jury that credited this testimony could rationally find the challenged statement material.

***Internal Abbott Documents***: Abbott's records consider consumers' receptiveness to the challenged statement and their reasons for buying PediaSure. A 2020 marketing presentation reported the results of an online survey of more than 500 mothers, which tested the statements that made respondents most likely to purchase PediaSure. Ex. AA at 63960. The challenged statement ranked third out of 13 options. *Id.* A 2024 marketing presentation stated that, in 2019, "height households had significant buy rate growth," and that the fourth most popular reason consumers purchased PediaSure was that to "help child grow." Ex. Z at 40102, 40142. Other internal documents support that height growth was a significant reason for purchases. *See, e.g.*, Ex. Y at 58038 (51% of respondents want to buy products that "help my child grow in height"); Ex. X at 45697 (20% of respondents give children PediaSure to help "grow in height"). Such internal Abbott evidence, viewed in the light most favorable to Noriega, would give a reasonable jury added reason to find that the representation as to height growth was consequential to consumer decisions to purchase PediaSure.[22]

Opposing this conclusion, Abbott notes, first, that its internal records do not literally show that consumers purchased PediaSure *because of* the challenged statement. SJ Reply at 8–9.

---

[22] Similar testimony by Abbott's employees could also be read to support such a finding. *See, e.g.*, Ex. O at 47 (Abbott's senior director of market insights and analytics, stating that challenged statement is "important to some consumers").

But the documents do support the building blocks of a materiality finding. They support that consumers were more likely to purchase because of the challenged statement, and that height growth was a primary motivator for many consumers. Viewed in the light most favorable to Noriega, Abbott's internal documents support her on this element.

Second, Abbott argues that the survey by its expert, Dr. Kivetz, finding that the challenged statement is "*not* material to consumers," is dispositive, because Noriega's evidence does not contradict such testimony. SJ Reply at 9 (emphasis in original). That is wrong. Although Dr. Johar did not conduct a survey, her report reaches the opposite conclusion from Dr. Kivetz's report as to materiality, and is viable admissible evidence on this point. *See* Johar Report at 14–15. It alone would supply a sufficient basis to find materiality. *See, e.g.*, *Capri Sun*, 595 F. Supp. 3d at 143 ("Summary judgment is not favored in cases involving materially conflicting expert reports." (citing *Solorio v. Asplundh Tree Expert Co.*, 402 F. Supp. 2d 490, 497 (S.D.N.Y. 2005)); *Chen-Oster v. Goldman, Sachs & Co.*, No. 10 Civ. 6950, 2022 WL 814074, at *26 (S.D.N.Y. Mar. 17, 2022) ("Where, as here, two experts have put forth admissible opinions that disagree, summary judgment is improper.").

Noriega has thus adduced sufficient evidence to reach a jury on the element of materiality.

### 3. Injury

A plaintiff must prove "actual injury" to recover actual or statutory damages under GBL §§ 349 and 350, though "not necessarily pecuniary harm." *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000) (cleaned up); *Colpitts v. Growers*, No. 20 Civ. 2487, 2023 WL 2752161,

70

at *3 (S.D.N.Y. Mar. 31, 2023).[23]  Courts have recognized several ways for a plaintiff to prove actual injury under those statutes.  A plaintiff can show that she "paid a premium as a result of the deception—*i.e.*, [s]he paid a higher price for a product than [s]he otherwise would have paid," because of the deception.  *Brockington v. Dollar Gen. Corp.*, No. 22 Civ. 6666, 2025 WL 486173, at *4 (S.D.N.Y. Feb. 13, 2025).  Alternatively, a plaintiff can show that she purchased a product in reliance on the misrepresentation and "did not receive the full value of her purchase" (*i.e.*, the benefit of her bargain).  *Id.*  A plaintiff can also show that "the product adversely affected plaintiff's health."  *Preira v. Bancorp Bank*, 885 F. Supp. 2d 672, 677 (S.D.N.Y. 2012) (citation omitted).  But "the fact that a plaintiff was deceived is not, standing alone, an actual injury."  *Irvine v. Kate Spade & Co.*, No. 16 Civ. 7300, 2017 WL 4326538, at *3 (S.D.N.Y. Sept. 28, 2017) (citation omitted); *see also Colpitts*, 2023 WL 2752161, at *4 n.3 ("merely purchasing a mislabeled product is not an injury . . . absent further proof that the purchase in some way injured the plaintiff").

Here, Noriega has adduced sufficient evidence to survive summary judgment on one theory of injury: a benefit-of-the-bargain theory.  Noriega testified that she purchased PediaSure because L.V. was "behind in height," Noriega Dep. at 71, and the product's marketing had conveyed that it "helps kids grow in height," *id.* at 107, 122, 125.  She testified that she "expected for it to help . . . impulse [sic] his growth and height," *id.* at 85, and to enable L.V. to reach a height "like every other child at his age," *id.* at 125–26.  She testified that she stopped buying PediaSure in 2023 because she was "looking to see that L.V. would reach his height in

---

[23] A plaintiff seeking statutory damages must still prove injury, as that requirement is an element of GBL §§ 349 and 350. *See, e.g.*, *Colpitts*, 2023 WL 2752161, at *3 (question of remedies "distinct from the question of liability"); *Kelly v. Beliv LLC*, No. 21 Civ. 8134, 2024 WL 1076217, at *11 n.11 (S.D.N.Y. Mar. 12, 2024) (same).

age and height in weight, and he didn't grow the amount that I was expecting." *Id.* at 142–43; *see also id.* at 135, 223. She testified that $3.25—the cost she claims to have paid per bottle—is "a lot to pay for something," and that she understood PediaSure to cost more money on account of its capacity to improve height. *Id.* at 238–39 (the height representation on the packaging "will bring up their price," and warrants "a big price," because "it's kind of like a guarantee"). She testified that she believed that she was "paying more" for the prospect of height benefits. *Id.* at 239. She testified that she would not have bought PediaSure had the challenged statement not been on the label. *Id.* at 128.

A rational jury, crediting Noriega's testimony, could find that she detrimentally relied on the challenged statement. It could find that she suffered injury because she did not receive the full value of her purchase, which she made based on the misleading representation about PediaSure's clinically-proven height growth benefits. Her case is thus afield from those where a plaintiff has failed to adduce evidence of any injury, meriting summary judgment for the defense. *See, e.g., Brockington*, 2025 WL 486173, at *6 (plaintiff failed to show he did not receive full value of purchase where he "testified at his deposition that he does not believe that the Product was worth less than what he paid for it, even knowing what he now knows about the Product's ingredients"); *Kelly v. Beliv LLC*, No. 21 Civ. 8134, 2024 WL 1076217, at *11 (S.D.N.Y. Mar. 12, 2024) (same where plaintiff's testimony contradicted allegation that he received "anything less than what he contends is the product he was promised," revealing he "received exactly what he understood he would receive"); *see also Segovia*, 2017 WL 6398747, at *4

(plaintiff failed to show pecuniary injury where he did not testify that, but for challenged claims, "he would have been unwilling to pay Defendant's price").[24]

That said, Noriega's testimony is not competent to establish a separate theory of damages she pursues—a price premium theory. A plaintiff can establish the existence of a price premium with, *inter alia*, survey evidence or evidence that the product at issue sells for a higher price than a comparable product because of its use of the deceptive claim. *See, e.g., Eidelman v. Sun Prods. Corp.*, 2022 WL 1929250, at *1 (2d Cir. June 6, 2022) (summary order); *Hasemann*, 2024 WL 1282368, at *18.

Noriega has not come forward with admissible evidence to this effect. The Court has excluded as unreliable and inadmissible Dr. Ingersoll's testimony that, based on the survey he conducted, there was a price premium attributable to the challenged statement. And although there is some evidence that PediaSure sold at a higher price than products with some similarities, *see* Ex. KK at 46399, Noriega has not adduced evidence that other products were the same in all material respects other than the challenged statement (*e.g.*, in their ingredients, caloric content,

---

[24] Abbott argues that Noriega's testimony cannot support injury to herself, because she has "no proof of purchase." SJ Reply at 10. That is wrong. As Abbott's counsel acknowledged at Noriega's deposition, Noriega has submitted a declaration supporting the fact of her purchases from the clerk of the store at which she attests she bought nearly every bottle of PediaSure she purchased. Noriega Dep. at 145–46; *see also* Oral Arg. Tr. at 115 (counsel for Noriega confirming "declaration from the store clerk"). And Noriega testified to the price she paid for PediaSure, where and how often she purchased it, and that she paid in cash. *See* Noriega Dep. at 131–42. Abbott has not cited any cases where the testimony of the buyer and seller to the fact of such purchases was found inadequate to establish them. In the case on which Abbott relies, the plaintiff offered "neither specific testimonial facts nor records" as to injury. *Osdoby v. Handi-Foil Corp.*, No. 22 Civ. 4199, 2026 WL 388606, at *9 (E.D.N.Y. Feb. 12, 2026) (insufficient evidence of injury where plaintiff "does not provide dates, months, or specific locations of her purchases"). In light of the admissible evidence of Noriega's purchases, Abbott's rhetorical swipe that her testimony is "self-serving," SJ Reply at 10, gains no traction.

and nutritional value).[25]  At argument, Noriega's counsel could not point to internal Abbott documents supporting that the challenged statement increased the price consumers would pay, that Abbott so understood, or that the price Abbott charged for PediaSure increased at the time it added the challenged statement.  Oral Arg. Tr. at 92–93.  And Noriega did not testify about PediaSure relative to comparable products in the market; she testified that she did not consider other nutrition shakes for her grandson.  Noriega Dep. at 85–89.  Without more, the subjective perception of this lone consumer that PediaSure's price was higher on account of its height claim cannot establish that, in fact, the challenged statement drove up PediaSure's market price.  There is thus insufficient evidence to permit a rational juror to find a price premium traceable to the challenged statement.  *Cf. Eidelman*, 2022 WL 19292, at *2 (denying defense motion for summary judgment on injury element of GBL §§ 349 and 350 claims, where defendant's "internal communications impl[ied] that the Defendants could charge a higher price because of the allegedly misleading claim").

Noriega's claims thus survive as to the injury element, based on a benefit-of-the-bargain theory, but not on a price premium theory.  *See, e.g., Orlander*, 802 F.3d at 302 (no "rigid" requirement that price premium be proven to make out claim under GBL §§ 349 and 350; plaintiff can show "she purchased a product and did not receive the full value of her purchase"); *Brockington*, 2025 WL 486173, at *4 (recognizing benefit-of-bargain theory as viable method of proving injury); *Kelly*, 2024 WL 1076217, at *10 (same); *Osdoby v. Handi-Foil Corp.*, No. 22

---

[25] At argument, Noriega contended that Fairlife and Carnation Breakfast are comparator products "interchangeable" with PediaSure (*i.e.*, materially the same save the challenged statement).  Oral Arg. Tr. at 98–99.  In fact, PediaSure's internal marketing documents noted consequential differences between PediaSure and those products.  *See* Ex. AA at 63975 (noting, among "key difference[s]" from PediaSure, that Carnation Breakfast claims to contain fewer vitamins and minerals, and Fairlife claims to have "[m]ore protein and less sugar").

Civ. 4199, 2026 WL 388606, at *10 (E.D.N.Y. Feb. 12, 2026) (same); *Jackson-Mau v. Walgreen Co.*, 652 F. Supp. 3d 349, 361 (E.D.N.Y. 2023) (same), *aff'd*, 115 F.4th 121 (2d Cir. 2024).

### 4.    Overall Assessment

Noriega has adduced sufficient evidence to reach a jury on each element of her GBL §§ 349 and 350 claims.  The Court thus denies Abbott's motion for summary judgment.  *See, e.g.*, *Price*, 2020 WL 4937464, at *9–11 (denying defense motion for summary judgment on GBL §§ 349 and 350 claims); *Hasemann*, 2024 WL 1282368, at *12 (same); *Volino*, 2024 WL 1251185, at *9 (same); *Ebin v. Kangadis Food Inc.*, No. 13 Civ. 2311, 2014 WL 737878, at *2 (S.D.N.Y. Feb. 25, 2014) (same).

## CONCLUSION

For the foregoing reasons, the Court denies Abbott's summary judgment motion; denies in full Abbott's motion to exclude Dr. Johar's testimony; grants in part and denies in part Abbott's motion to exclude Dr. Hoffman's testimony; grants in full Abbott's motion to exclude Dr. Ingersoll's testimony; denies, save as to a minor point, Noriega's motion to exclude Dr. Hoffman's testimony; and grants in part and denies in part Noriega's motion to exclude Dr. Heyman's testimony.  The Clerk of Court is respectfully directed to terminate the motions pending at dockets 72, 77, 81, 85, 90, 99, and 100.

An order will issue shortly as to next steps in this litigation.

SO ORDERED.

*Paul A. Engelmayer*
_____
PAUL A. ENGELMAYER
United States District Judge

Dated: June 4, 2026
       New York, New York